290 F.3d 1058
PLANNED PARENTHOOD OF THE COLUMBIA/WILLAMETTE, INC.; Portland Feminist Women's Health Center; Robert Crist, M.D.; Warren M. Hern, M.D.; Elizabeth Newhall, M.D.; James Newhall, M.D., Plaintiffs-Appellees, andKaren Sweigert, M.D., Plaintiff,v.AMERICAN COALITION OF LIFE ACTIVISTS; Advocates for Life Ministries; Michael Bray; Andrew Burnett; David A. Crane; Timothy Paul Dreste; Michael B. Dodds; Joseph L. Foreman; Charles Roy McMillan; Stephen P. Mears; Bruce Evan Murch; Catherine Ramey; Dawn Marie Stover; Charles Wysong, Defendants, andMonica Migliorino Miller; Donald Treshman, Defendants-Appellants.Planned Parenthood of the Columbia/Willamette, Inc.; Portland Feminist Women's Health Center; Robert Crist, M.D.; Warren M. Hern, M.D.; Elizabeth Newhall, M.D.; James Newhall, M.D., Plaintiffs-Appellees, andKaren Sweigert, M.D., Plaintiff,v.American Coalition of Life Activists; Advocates for Life Ministries; Michael Bray; Andrew Burnett; David A. Crane; Timothy Paul Dreste; Joseph L. Foreman; Stephen P. Mears; Monica Migliorino Miller; Catherine Ramey; Dawn Marie Stover; Donald Treshman; Charles Wysong, Defendants, andMichael Dodds; Charles Roy McMillan; Bruce Evan Murch, Defendants-Appellants.Planned Parenthood of the Columbia/Willamette, Inc.; Portland Feminist Women's Health Center; Robert Crist, M.D.; Warren M. Hern, M.D.; Elizabeth Newhall, M.D.; James Newhall, M.D., Plaintiffs-Appellees, andKaren Sweigert, M.D., Plaintiff,v.American Coalition of Life Activists; Advocates for Life Ministries; Michael Bray; Andrew Burnett; David A. Crane; Michael Dodds; CharlesRoy McMillan; Stephen P. Mears; Monica Migliorino Miller; Bruce Evan Murch; Catherine Ramey; Dawn Marie Stover; Donald Treshman, Defendants, andTimothy Paul Dreste; Joseph L. Foreman; Charles Wysong, Defendants-Appellants.Planned Parenthood of the Columbia/Willamette, Inc.; Portland Feminist Women's Health Center; Robert Crist, M.D.; Warren M. Hern, M.D.; Elizabeth Newhall, M.D.; James Newhall, M.D., Plaintiffs-Appellees, andKaren Sweigert, M.D., Plaintiff,v.American Coalition of Life Activists; Advocates for Life Ministries; Michael Bray; Andrew Burnett; David A. Crane; Catherine Ramey; Dawn Marie Stover, Defendants-Appellants, andTimothy Paul Dreste; Michael Dodds; Joseph L. Foreman; Charles Roy McMillan; Stephen P. Mears; Monica Migliorino Miller; Bruce Evan Murch; Donald Treshman; Charles Wysong, Defendants.Planned Parenthood of the Columbia/Willamette, Inc.; Portland Feminist Women's Health Center; Robert Crist, M.D.; Warren M. Hern, M.D.; Elizabeth Newhall, M.D.; James Newhall, M.D., Plaintiffs-Appellees,v.American Coalition of Life Activists; Advocates for Life Ministries; Michael Bray; Andrew Burnett; David A. Crane; Timothy Paul Dreste; Michael B. Dodds; Joseph L. Foreman; Charles Roy McMillan; Bruce Evan Murch; Catherine Ramey; Dawn Marie Stover; Donald Treshman; Charles Wysong, Defendants.Paul deParrie, Movant-Appellant.Planned Parenthood of the Columbia/Willamette, Inc.; Portland Feminist Women's Health Center; Robert Crist, M.D.; Warren M. Hern, M.D.; Elizabeth Newhall, M.D.; James Newhall, M.D.; Karen Sweigert, M.D., individually and on behalf of all persons similarly situated, Plaintiffs-Appellees,v.American Coalition of Life Activists; Advocates for Life Ministries; Michael Bray; Andrew Burnett; David Crane; Timothy Paul Dreste; Michael Dodds; Joseph L. Foreman; Charles Roy McMillan; Monica Migliorino Miller; Bruce Evan Murch; Catherine Ramey; Dawn Marie Stover; Donald Treshman; Charles Wysong, Defendants-Appellants.
No. 99-35320.
No. 99-35325.
No. 99-35327.
No. 99-35331.
No. 99-35333.
No. 99-35405.
United States Court of Appeals, Ninth Circuit.
Argued and Submitted En Banc December 11, 2001.
Filed May 16, 2002.
Rehearing En Banc Denied July 10, 2002.*

COPYRIGHT MATERIAL OMITTED Christopher A. Ferrara, American Catholic Lawyers Ass'n Inc., Ramsey, NJ, for defendants-appellants Donald Treshman and Monica Migliorino Miller.
Stephen J. Safranek, Richard Thompson, and Edward L. White, III, Thomas More Center for Law & Justice, Ann Arbor, MI, for defendants-appellants American Coalition of Life Activists, Advocates for Life Ministries, Andrew Burnett, David Crane, Catherine Ramey, Michael Bray, and Dawn Stover.
Maria T. Vullo, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, for plaintiffs-appellees Planned Parenthood of the Columbia/Willamette, Inc., Portland Feminist Women's Health Center, Robert Crist, M.D., Warren Hern, M.D., Elizabeth P. Newhall, M.D., and James Newhall, M.D.
Robert M. O'Neil, for amicus curiae Thomas Jefferson Center for the Protection of Free Expression, Charlottesville, VA.
Paul deParrie, Portland, OR, amicus curiae pro se.
Michael H. Simon, Perkins Coie LLP, Portland, OR, for amicus curiae ACLU Foundation of Oregon, Inc.
Susan M. Popik, Chapman, Popik & White, San Francisco, CA, for amici curiae Feminist Majority Foundation, Center for Reproductive Law and Policy, National Abortion and Reproductive Rights Action League and NARAL Foundation, National Abortion Federation, National Coalition of Abortion Providers, National Organization for Women Foundation, NOW Legal Defense and Education Fund, National Women's Health Foundation, Northwest Women's Law Center, Physicians for Reproductive Choice and Health, and Women's Law Project.
Eliot D. Prescott and Jane R. Rosenberg, Assistant Attorneys General of Connecticut, for amici curiae Connecticut, Arizona, California, Colorado, Hawaii, Kansas, Montana, Nevada, New York, Oklahoma, Oregon and Washington.
Erwin Chemerinsky, University of Southern California Law School, Los Angeles, CA, for amici curiae Anti-Defamation League, The American Jewish Committee, Hadassah, the Women's Zionist Organization of America, Inc.
William A. Norris, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Los Angeles, CA, for amicus American Medical Association.
Lawrence S. Lustberg, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for amici curiae Senator Charles E. Schumer, et al.
Appeals from the United States District Court for the District of Oregon; Robert E. Jones, District Judge, Presiding. D.C. No. CV-95-01671-REJ (District of Oregon).
Before: SCHROEDER, Chief Judge, and REINHARDT, KOZINSKI, O'SCANNLAIN, RYMER, KLEINFELD, HAWKINS, SILVERMAN, WARDLAW, BERZON, and RAWLINSON, Circuit Judges.
Opinion by Judge RYMER; Dissent by Judge REINHARDT; Dissent by Judge KOZINSKI; Dissent by Judge BERZON.
RYMER, Circuit Judge.

1
For the first time we construe what the Freedom of Access to Clinics Entrances Act (FACE), 18 U.S.C. § 248, means by "threat of force." FACE gives aggrieved persons a right of action against whoever by "threat of force ... intentionally... intimidates ... any person because that person is or has been ... providing reproductive health services." 18 U.S.C. § 248(a)(1) and (c)(1)(A). This requires that we define "threat of force" in a way that comports with the First Amendment, and it raises the question whether the conduct that occurred here falls within the category of unprotected speech.

2
Four physicians, Dr. Robert Crist, Dr. Warren M. Hern, Dr. Elizabeth Newhall, and Dr. James Newhall, and two health clinics that provide medical services to women including abortions, Planned Parenthood of the Columbia/Willamette, Inc. (PPCW) and the Portland Feminist Women's Health Center (PFWHC), brought suit under FACE1 claiming that they were targeted with threats by the American Coalition of Life Activists (ACLA), Advocates for Life Ministries (ALM), and numerous individuals.2 Three threats remain at issue: the Deadly Dozen "GUILTY" poster which identifies Hern and the Newhalls among ten others; the Crist "GUILTY" poster with Crist's name, addresses and photograph; and the "Nuremberg Files," which is a compilation about those whom the ACLA anticipated one day might be put on trial for crimes against humanity. The "GUILTY" posters identifying specific physicians were circulated in the wake of a series of "WANTED" and "unWANTED" posters that had identified other doctors who performed abortions before they were murdered.

3
Although the posters do not contain a threat on their face, the district court held that context could be considered. It defined a threat under FACE in accordance with our "true threat" jurisprudence, as a statement made when "a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm." Applying this definition, the court denied ACLA's motion for summary judgment in a published opinion. Planned Parenthood of the Columbia/Willamette, Inc. v. ACLA (PPCW II), 23 F.Supp.2d 1182 (D.Or. 1998).3 The jury returned a verdict in physicians' favor, and the court enjoined ACLA from publishing the posters or providing other materials with the specific intent to threaten Crist, Hern, Elizabeth Newhall, James Newhall, PPCW, or the Health Center. Planned Parenthood of the Columbia/Willamette, Inc. v. ACLA (PPCW III), 41 F.Supp.2d 1130 (D.Or. 1999). ACLA timely appealed.

4
A panel of this court reversed. In its view, the standard adopted by the district court allowed the jury to find ACLA liable for putting the doctors in harm's way by singling them out for the attention of unrelated but violent third parties, conduct which is protected by the First Amendment, rather than for authorizing or directly threatening harm itself, which is not. Planned Parenthood of the Columbia/Willamette, Inc. v. ACLA (PPCW IV), 244 F.3d 1007 (9th Cir.), reh'g en banc granted, 268 F.3d 908 (9th Cir.2001). The panel decided that it should evaluate the record independently to determine whether ACLA's statements could reasonably be construed as saying that ACLA, or its agents, would physically harm doctors who did not stop performing abortions. Having done so, the panel found that the jury's verdict could not stand.

5
We reheard the case en banc because these issues are obviously important. We now conclude that it was proper for the district court to adopt our long-standing law on "true threats" to define a "threat" for purposes of FACE. FACE itself requires that the threat of force be made with the intent to intimidate. Thus, the jury must have found that ACLA made statements to intimidate the physicians, reasonably foreseeing that physicians would interpret the statements as a serious expression of ACLA's intent to harm them because they provided reproductive health services. Construing the facts in the light most favorable to physicians, the verdict is supported by substantial evidence. ACLA was aware that a "wanted"-type poster would likely be interpreted as a serious threat of death or bodily harm by a doctor in the reproductive health services community who was identified on one, given the previous pattern of "WANTED" posters identifying a specific physician followed by that physician's murder. The same is true of the posting about these physicians on that part of the "Nuremberg Files" where lines were drawn through the names of doctors who provided abortion services and who had been killed or wounded. We are independently satisfied that to this limited extent, ACLA's conduct amounted to a true threat and is not protected speech.

6
As we see no reversible error on liability or in the equitable relief that was granted, we affirm. However, we remand for consideration of whether the punitive damages award comports with due process.

7
* The facts are fully set out in the district court's order granting injunctive relief, PPWC III, 41 F.Supp.2d at 1131-1155, and we shall not belabor them. In sum:

8
On March 10, 1993, Michael Griffin shot and killed Dr. David Gunn as he entered an abortion clinic in Pensacola, Florida. Before this, a "WANTED" and an "unWANTED" poster with Gunn's name, photograph, address and other personal information were published. The "WANTED" poster describes Gunn as an abortionist and invites participation by prayer and fasting, by writing and calling him and sharing a willingness to help him leave his profession, and by asking him to stop doing abortions; the "unWANTED" poster states that he kills children at designated locations and "[t]o defenseless unborn babies Gunn in [sic] heavily armed and very dangerous." After Gunn's murder, Bray and Paul Hill (a non-party who was later convicted of murdering a different doctor) prepared a statement supporting Griffin's acquittal on a justifiable homicide theory, which ALM, Burnett, Crane, Dodds, Foreman, McMillan, Ramey and Stover joined.

9
On August 21, 1993, Dr. George Patterson, who operated the clinic where Gunn worked, was shot to death. A "WANTED" poster had been circulated prior to his murder, indicating where he performed abortions and that he had Gunn perform abortions for his Pensacola clinic.

10
In July 1994, Dr. John Bayard Britton was murdered by Paul Hill after being named on an "unWANTED" poster that Hill helped to prepare. One gives Britton's physical description together with his home and office addresses and phone numbers, and charges "crimes against humanity"; another also displays his picture and states that "he is considered armed and extremely dangerous to women and children. Pray that he is soon apprehended by the love of Jesus!!!" In addition to these items, a third version of the Britton "unWANTED" poster lists personal achievements and Britton's "crimes against humanity," also warning that "John Bayard Britton is considered armed and extremely dangerous, especialy [sic] to women and children." ALM, Bray, Burnett, Crane, McMillan, Ramey and Stover signed a petition supporting Hill.

11
Many pro-life activists in Operation Rescue condemned these acts of violence. As a result, ALM, Bray, Burnett, Crane, Foreman, McMillan, Ramey and Stover, who espoused a "pro-force" point of view, split off to form ACLA. Burnett observed, "if someone was to condemn any violence against abortion, they probably wouldn't have felt comfortable working with us." Organizational meetings were held in the spring of 1994, and ACLA's first event was held in August 1994. ACLA is based in Portland, Oregon, as is ALM. ALM publishes Life Advocate, a magazine that is distributed nationally and advocates the use of force to oppose the delivery of abortion services. Except for Bray, who authored A Time to Kill and served time in federal prison for conspiring to bomb ten clinics, the individual defendants were directors of ACLA and actively involved in its affairs. ALM commissioned and published Bray's book, noting that it "shows the connection between the [justifiable homicide] position and clinic destruction and the shootings of abortionists." Wysong and ACLA also drafted and circulated a "Contract on the Abortion Industry," having deliberately chosen that language to allude to mafia hit contracts.

12
ACLA presented the Deadly Dozen poster during a January 25, 1995 press conference at the March for Life event in Washington, D.C. Bray, Burnett, Crane, Dodds, Foreman, McMillan, Murch, Ramey, Stover, Treshman and Wysong were there; Dreste later ratified the poster's release. This poster is captioned "GUILTY" at the top (which meant the same thing to Crane, who drafted it, as "wanted"), beneath which in slightly smaller print the poster indicates "OF CRIMES AGAINST HUMANITY." The poster continues: "Abortion was provided as a choice for East European and Jewish women by the (Nazi) National Socialist Regime, and was prosecuted during the Nuremberg Trials (1945-46) under Allied Control Order No. 10 as a `war crime.'" Under the heading "THE DEADLY DOZEN," the poster identifies thirteen doctors of whom James Newhall, Elizabeth Newhall, and Warren Hern are three. The poster provides Hern's residence and the home address of James Newhall and Elizabeth Newhall; it also lists the name and home address of Dr. George Kabacy, a doctor who provided abortions at PPCW. It offers a "$5,000 REWARD" "for information leading to arrest, conviction and revocation of license to practice medicine." At the bottom the poster bears the legend "ABORTIONIST" in large, bold typeface. The day after the Deadly Dozen poster was released, the FBI offered protection to doctors identified on it and advised them to wear bulletproof vests and take other security precautions, which they did. Knowing this, ALM reprinted the poster in the March 1995 edition of its magazine Life Advocate under a cover with the "grim reaper" holding a scythe; Murch printed it in his newsletter Salt & Light; and ACLA republished the Deadly Dozen poster at events in August 1995 and January 1996.

13
ACLA released the Crist poster along with five others in August 1995 at the old federal courthouse in St. Louis where the Dred Scott decision had been handed down. Burnett, Crane, Dreste, McMillan, Ramey, Stover and Wysong attended the event. Three of the posters identify doctors; the others identify reproductive health care clinics, one of which was a Planned Parenthood affiliate where Crist worked. The Crist poster has "GUILTY" in large bold letters at the top followed by "OF CRIMES AGAINST HUMANITY" in smaller font. It also gives his home and work addresses; states "Please write, leaflet or picket his neighborhood to expose his blood guilt"; offers a "$500 REWARD" "to any ACLA organization that successfully persuades Crist to turn from his child killing through activities within ACLA guidelines"; and has "ABORTIONIST" in large bold type at the bottom.

14
At its January 1996 conference, ACLA displayed the Deadly Dozen poster, held a "White Rose Banquet" to honor prisoners convicted of anti-abortion violence, and introduced ALM's Paul deParrie to unveil the "Nuremberg Files." ACLA sent a hard copy of some of the Files to Neal Horsley (a non-party) to post on the internet, and ACLA's name appeared on the Nuremberg Files website opened in January 1997. Approximately 200 people are listed under the label "ABORTIONISTS: the shooters," and 200 more are listed under Files for judges, politicians, law enforcement, spouses, and abortion rights supporters. Crist, Hern and the Newhalls are listed in the "abortionists" section, which bears the legend: "Black font (working); Greyed-out Name (wounded); Strikethrough (fatality)." The names of Gunn, Patterson and Britton are struck through.

15
By January 1995 ACLA knew the effect that "WANTED," "unWANTED," or "GUILTY" posters had on doctors named in them. For example, in a September 1993 issue of Life Advocate which reported that an "unwanted" poster was being prepared for Britton, ALM remarked of the Gunn murder that it "sent shock waves of fear through the ranks of abortion providers across the country. As a result, many more doctors quit out of fear for their lives, and the ones who are left are scared stiff." Of another doctor who decided to quit performing abortions after circulation of a "Not Wanted" poster, Bray wrote that "it is clear to all who possess faculties capable of inductive analysis: he was bothered and afraid." Wysong also stated: "Listening to what abortionists said, abortionists who have quit the practice who are no longer killing babies but are now prolife. They said the two things they feared the most were being sued for malpractice and having their picture put on a poster." And Burnett testified with respect to the danger that "wanted" or "guilty" posters pose to the lives of those who provide abortions: "I mean, if I was an abortionist, I would be afraid."

16
By January 1995 the physicians knew about the Gunn, Patterson and Britton murders and the posters that preceded each. Hern was terrified when his name appeared on the Deadly Dozen poster; as he put it: "The fact that wanted posters about these doctors had been circulated, prior to their assassination, and that the — that the posters, then, were followed by the doctor's assassination, emphasized for me the danger posed by this document, the Deadly Dozen List, which meant to me that — that, as night follows day, that my name was on this wanted poster ... and that I would be assassinated, as had the other doctors been assassinated." Hern interpreted the poster as meaning "Do what we tell you to do, or we will kill you. And they do." Crist was "truly frightened," and stopped practicing medicine for a while out of fear for his life. Dr. Elizabeth Newhall interpreted the Deadly Dozen poster as saying that if she didn't stop doing abortions, her life was at risk. Dr. James Newhall was "severely frightened" in light of the "clear pattern" of a wanted poster and a murder when there was "another wanted poster with my name on it."

17
The jury found for plaintiffs on all claims except for Bray and Treshman on the RICO claims.4 The district court then considered equitable relief. It found that each defendant used intimidation as a means of interfering with the provision of reproductive health services; that each independently and as a co-conspirator published and distributed the Deadly Dozen poster, the Crist poster, and the Nuremberg Files; and that each acted with malice and specific intent in communicating true threats to kill, assault or do bodily harm to each of the plaintiffs to intimidate them from engaging in legal medical practices and procedures. The court found that the balance of hardships weighed "overwhelmingly" in plaintiffs' favor. It also found that the defendants' actions were not protected speech under the First Amendment. Accordingly, it issued a permanent injunction restraining defendants from threatening, with the specific intent to do so, any of the plaintiffs in violation of FACE; from publishing or distributing the Deadly Dozen poster and the Crist poster with specific intent to threaten the plaintiffs; from providing additional material concerning plaintiffs, with a specific intent to threaten, to the Nuremberg Files or similar web site; and from publishing or distributing the personally identifying information about the plaintiffs in the Files with a specific intent to threaten. The court also required defendants to turn over materials that are not in compliance with the injunction except for one copy of anything included in the record, which counsel was permitted to retain.

II

18
Before turning to the merits, we must consider the standard of review because ACLA contends that in a free speech case it is de novo. Relying on Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), ACLA submits that we must first determine for ourselves whether its speech is classic protected speech or is a "true threat" by reviewing the entire record.

19
Physicians assert that the standard of review for which ACLA contends comes from libel cases, but that threat cases are different; the more searching review of the record incumbent upon courts in libel cases, they urge, is inapposite to threat cases. They also point out that we have decided all of our threats cases without engaging in de novo review of the factual record. See, e.g., United States v. Gilbert, 884 F.2d 454, 457 (9th Cir.1989) (Gilbert II) ("Viewed as a whole, and using the contextual analysis we have used for other statutes, a rational trier of fact could find a threat."); United States v. Gordon, 974 F.2d 1110, 1117 (9th Cir.1992) ("Although some of the factual circumstances surrounding the incident suggest a contrary result, the jury acted reasonably [in finding that] the threats were serious."); United States v. Orozco-Santillan, 903 F.2d 1262, 1266 (9th Cir.1990) ("[A] rational jury could conclude that Orozco-Santillan's statement ... was a threat."); see also United States v. Hoff, 22 F.3d 222, 224 (9th Cir.1994) (reviewing for clear error conviction for intimidating forest ranger).

20
We do not entirely agree with either side. It is true that our threats cases have been decided without conducting a de novo review of the factual record, but the issue was not squarely presented in any of those cases. For this reason, we cannot take it as definitively resolved.

21
In Bose (a defamation action arising out of a publication about loudspeaker systems), the Court confronted an apparent conflict between Federal Rule of Civil Procedure 52(a), providing that findings of fact shall not be set aside unless clearly erroneous, and its rule in cases raising First Amendment issues that "an appellate court has an obligation to `make an independent examination of the whole record' in order to make sure that `the judgment does not constitute a forbidden intrusion on the field of free expression.'" Bose, 466 U.S. at 498-99, 104 S.Ct. 1949 (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 284-86, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). The Court noted that it had previously exercised independent judgment on questions such as whether particular remarks are "fighting words," Street v. New York, 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969), and whether, as a matter of constitutional law, a motion picture is obscene. Jenkins v. Georgia, 418 U.S. 153, 159-61, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974). In this connection, the Court observed that in Jenkins it had rejected the notion that a jury finding (there of obscenity) "is insulated from review so long as the jury was properly instructed and there is some evidence to support its findings"; rather, substantive constitutional limitations govern. Bose, 466 U.S. at 506-07, 104 S.Ct. 1949. Therefore, it concluded, appellate judges must themselves determine whether the record establishes the constitutional facts required for showing actual malice with convincing clarity in a case governed by New York Times. This obligation does not, however, extend to any evidence that is not germane to the actual malice (or core constitutional fact) determination. Id. at 514 n. 31, 104 S.Ct. 1949.

22
The Court revisited the issue in Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Harte-Hanks was a libel action against a newspaper, also governed by New York Times. The court of appeals had affirmed a judgment against the paper without attempting to make an independent evaluation of the credibility of conflicting oral testimony concerning the facts underlying the jury's finding of actual malice. Certiorari was granted to consider whether the appellate court's analysis was consistent with Bose. Harte-Hanks conceded that when conducting the independent review required by New York Times and Bose, a reviewing court should properly hesitate to disregard a jury's opportunity to observe live testimony and assess witness credibility, but contended that the Supreme Court had nevertheless rejected the trial court's credibility determination in Bose. Justice Stevens, writing for the Court in both Bose and Harte-Hanks, noted that this was not correct; he explained that in Bose the Court had accepted the trial court's determination that the author of the report at issue did not provide credible testimony, but had been unwilling to infer actual malice from the finding. Id. at 689 n. 35, 109 S.Ct. 2678. The Harte-Hanks Court went on to review the entire record, holding that given the instructions, the jury's answers to special interrogatories, and the facts that were not in dispute, the jury must have found certain testimony incredible and that from these findings, considered with the undisputed evidence, it followed that the paper acted with actual malice and that the evidence was sufficient to support such a finding.

23
The same rule was reiterated in Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), a First Amendment case involving a parade permit. As the Court explained: "This obligation rests upon us simply because the reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and we must thus decide for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional protection." Id. at 567, 115 S.Ct. 2338.

24
We have discussed the issue a number of times, in connection with threats in United States v. Merrill, 746 F.2d 458 (9th Cir.1984), United States v. Gilbert (Gilbert I), 813 F.2d 1523 (9th Cir.1987), Melugin v. Hames, 38 F.3d 1478 (9th Cir.1994), and Lovell v. Poway United School Dist., 90 F.3d 367 (9th Cir.1996), and in defamation actions in Newton v. National Broadcasting Co., 930 F.2d 662 (9th Cir.1990), Eastwood v. National Enquirer, Inc., 123 F.3d 1249 (9th Cir.1997), and Hoffman v. Capital Cities/ABC, Inc., 255 F.3d 1180 (9th Cir.2001).

25
Merrill was prosecuted for mailing injurious articles through the mail (letters with live .22 caliber rim fire bullets, some with the words "Kill Reagan," some with pornographic playing cards) and for threatening the life of the President in violation of 18 U.S.C. § 871. ACLA relies on that part of Merrill where we considered the obscenity conviction under the Bose standard of review. We interpreted Bose and Smith v. United States, 431 U.S. 291, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977), as allowing deferential (sufficiency of the evidence) review of findings about contemporary community standards and the offensiveness of the material, but as requiring more extensive review of the district court's findings that Miller's letters lacked serious political value. Smith, 431 U.S. at 305, 97 S.Ct. 1756 (whether a work lacks serious literary, artistic, political, or scientific value for purposes of an obscenity prosecution is a "determination... particularly amenable to appellate review"). However, we did not apply heightened review to the threats conviction. Instead, we stated:

26
Whether any given form of written or oral expression constitutes a true threat for the statute's [§ 871] purposes is a question for the trier of fact under all of the circumstances. Roy v. United States, 416 F.2d [874,] 877-78 [(9th Cir. 1969)]. A few cases may be so clear that they can be resolved as a matter of law, e.g., Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664[] (1969) (conditional statement made at political rally which provoked listeners' laughter was merely "political hyperbole," and question should not have gone to jury), but most cases arising under this statute present widely varying fact patterns that should be left to the trier of fact. United States v. Carrier, 672 F.2d [300,] 306 [(2d Cir.1982)].

27
Merrill, 746 F.2d at 462-63. Under this standard we held that the district judge was not clearly erroneous in finding that the letters constituted an objectively serious threat to harm the President.

28
We followed Merrill in Gilbert I, 813 F.2d at 1529-30. Gilbert was charged with violating the Fair Housing Act, 42 U.S.C. § 3631(b) and (c), by mailing menacing flyers to intimidate the director of an adoption organization responsible for the placement and adoption of black and Asian children from aiding minority children's occupancy of dwellings in Kootenai County. Noting that whether expression is a true threat is for the trier of fact, we recognized that "[w]hether any given form of written expression can supply the requisite intent requirement is a question for the trier of fact." Gilbert I, 813 F.2d at 1529. Thus, "it is a jury question whether actions and communications are clearly outside the ambit of first amendment protection." Id. at 1530. And following the Seventh Circuit's lead in United States v. Khorrami, 895 F.2d 1186, 1192 (7th Cir. 1990), we held in Melugin that "the issue whether the prosecution has shown a `true threat' is a question of fact for the jury, not a question of law for the court." Melugin, 38 F.3d at 1485.

29
Lovell was a § 1983 action in which a student was suspended for allegedly threatening to shoot a teacher. We acknowledged that "[d]ifferent standards are sometimes used when reviewing district court cases in which the court adjudged the constitutionality of a restriction on speech," and that a de novo review of the facts is conducted when a restriction is upheld. Lovell, 90 F.3d at 370.

30
Newton was a defamation action brought by Wayne Newton (a public figure) against NBC. It was tried to a jury, which found actual malice. The appeal caused us specifically to consider how "to strike the proper balance between our constitutional (Seventh Amendment) deference to the factfinder and our constitutional duty to safeguard First Amendment values" in light of Bose and Harte-Hanks. Newton, 930 F.2d at 666. We observed that the "independent examination of the record" contemplated by Bose is "`not equivalent to a "de novo" review of the ultimate judgment itself,'" where the reviewing court makes an "original appraisal of all the evidence to decide whether or not judgment should be entered for the plaintiff." Id. at 670 n. 10 (quoting Bose, 466 U.S. at 514 n. 31, 104 S.Ct. 1949). However, we also noted that as a general rule, we have conducted de novo review of the record when a restriction on speech has been upheld. Id. (citing Daily Herald Co. v. Munro, 838 F.2d 380, 383 (9th Cir.1988)). We then read Bose and Harte-Hanks as creating a "credibility exception" to the New York Times rule of independent review, such that we give "special deference" to credibility determinations but conduct "a more searching review of other evidence" germane to the actual malice determination. Id. at 671, 672.

31
Eastwood was another defamation action in which we engaged in an independent review of actual malice. We thought that the jury was properly instructed, but in conducting the review we explained that "it is not enough for us to determine that a reasonable jury could have found for the plaintiff — a kind of sufficiency-of-the-evidence test, permitting us to affirm even though we would have reached a different conclusion. Rather, `First Amendment questions of "constitutional fact" compel [us to conduct a] de novo review.' We ourselves must be convinced that the defendant acted with malice," even though we defer to the jury on questions of credibility. Eastwood, 123 F.3d at 1252 (citations omitted). See also Hoffman, 255 F.3d at 1186 (relying on Eastwood).

32
It is not easy to discern a rule from these cases that can easily be applied in a threats case where, by definition, a true threat is constitutionally unprotected. Indeed, FACE on its face requires that "threat of force" be defined and applied consistent with the First Amendment. Perhaps this explains why we have treated threat cases differently, explicitly holding that the question of whether there is a true threat is for the jury.

33
We conclude that the proper definition of a "threat" for purposes of FACE is a question of law that we review de novo. If it were clear that neither the Deadly Dozen nor the Crist poster, or the Nuremberg Files, was a threat as properly defined, the case should not have gone to the jury and summary judgment should have been granted in ACLA's favor. If there were material facts in dispute or it was not clear that the posters were protected expression instead of true threats, the question whether the posters and the Files amount to a "threat of force" for purposes of the statute was for the trier of fact. Assuming that the district court correctly defined "threat" and properly instructed the jury on the elements of liability pursuant to the statute, our review is for substantial evidence supporting the historical facts (including credibility determinations) and the elements of statutory liability (including intent). We review the district court's findings with respect to injunctive relief for clear error and its conclusions of law de novo. However, while we normally review the scope of injunctive relief for abuse of discretion, we will scrutinize the relief granted in this case to determine whether the challenged provisions of the injunction burden no more speech than necessary to achieve its goals. Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994).

34
Given that the verdict for physicians and the injunctive relief granted in their favor restrict speech, we review the record independently in order to satisfy ourselves that the posters and the Files constitute a "true threat" such that they lack First Amendment protection. We will consider the undisputed facts as true, and construe the historical facts, the findings on the statutory elements, and all credibility determinations in favor of the prevailing party. In this way we give appropriate deference to the trier of fact, here both the jury and the district judge, yet assure that evidence of the core constitutional fact — a true threat — falls within the unprotected category and is narrowly enough bounded as a matter of constitutional law.

III

35
ACLA5 argues that the First Amendment requires reversal because liability was based on political speech that constituted neither an incitement to imminent lawless action nor a true threat. It suggests that the key question for us to consider is whether these posters can be considered "true threats" when, in fact, the posters on their face contain no explicitly threatening language. Further, ACLA submits that classic political speech cannot be converted into non-protected speech by a context of violence that includes the independent action of others.

36
Physicians6 counter that this threats case must be analyzed under the settled threats law of this circuit. Following precedent, it was proper for the jury to take context into account. They point out that the district court limited evidence of anti-abortion violence to evidence tending to show knowledge of a particular defendant, and maintain that the objective standard on which the jury was instructed comports both with Ninth Circuit law and congressional intent. As the First Amendment does not protect true threats of force, physicians conclude, ACLA's speech was not protected.

37
* We start with the statute under which this action arises. Section 248(c)(1)(A) gives a private right of action to any person aggrieved by reason of the conduct prohibited by subsection (a). Subsection (a)(1) provides:

38
(a) ... Whoever —

39
(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services

40
. . .

41
shall be subject to the ... civil remedies provided in subsection (c) ....

42
18 U.S.C. § 248(a)(1). The statute also provides that "[n]othing in this section shall be construed ... to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution." 18 U.S.C. § 248(d)(1).

43
FACE does not define "threat," although it does provide that "[t]he term `intimidate' means to place a person in reasonable apprehension of bodily harm to him — or herself or to another." 18 U.S.C. § 248(e)(3). Thus, the first task is to define "threat" for purposes of the Act. This requires a definition that comports with the First Amendment, that is, a "true threat."

44
The Supreme Court has provided benchmarks, but no definition.

45
Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), makes it clear that the First Amendment protects speech that advocates violence, so long as the speech is not directed to inciting or producing imminent lawless action and is not likely to incite or produce such action. So do Hess v. Indiana, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (overturning disorderly conduct conviction of antiwar protestor who yelled "We'll take the fucking street later (or again)"), and NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). If ACLA had merely endorsed or encouraged the violent actions of others, its speech would be protected.

46
However, while advocating violence is protected, threatening a person with violence is not. In Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), the Court explicitly distinguished between political hyperbole, which is protected, and true threats, which are not. Considering how to construe a statute which prohibited "knowingly and willfully... (making) any threat to take the life of or to inflict bodily harm upon the President," the Court admonished that any statute which criminalizes a form of pure speech "must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." Id. at 705, 707, 89 S.Ct. 1399. In that case, an 18-year old war protester told a discussion group of other young people at a public rally on the Washington Monument grounds: "They always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." Id. at 706, 89 S.Ct. 1399. His audience laughed. Taken in context, and given the conditional nature of the statement and the reaction of the listeners, the Court concluded that the speech could not be interpreted other than as "a kind of very crude offensive method of stating a political opposition to the President." Id. at 708, 89 S.Ct. 1399. Accordingly, it ordered judgment entered for Watts.

47
ACLA's position is that the posters, including the Nuremberg Files, are protected political speech under Watts, and cannot lose this character by context. But this is not correct. The Court itself considered context and determined that Watts's statement was political hyperbole instead of a true threat because of context. Id. at 708, 89 S.Ct. 1399. Beyond this, ACLA points out that the posters contain no language that is a threat. We agree that this is literally true. Therefore, ACLA submits, this case is really an incitement case in disguise. So viewed, the posters are protected speech under Brandenburg and Claiborne, which ACLA suggests is the closest analogue. We disagree that Claiborne is closely analogous.

48
In March 1966 black citizens in Claiborne County made a list of demands for racial equality and integration. Unsatisfied by the response, several hundred black persons at a meeting of the local National Association for the Advancement of Colored People (NAACP) voted to place a boycott on white merchants in the area. The boycott continued until October 1969. During this period, stores were watched and the names of persons who violated the boycott were read at meetings of the NAACP at the First Baptist Church, and published in a local paper called "Black Times." These persons were branded as traitors to the black cause, were called demeaning names, and were socially ostracized. A few incidents of violence occurred. Birdshot was fired at the houses of two boycott violators; a brick was thrown through a windshield; and a flower garden was damaged. None of the victims ceased trading with white merchants. Six other incidents of arguably unlawful conduct occurred. White business owners brought suit against the NAACP and Charles Evers, its field secretary, along with other individuals who had participated in the boycott, for violating Mississippi state laws on malicious interference with a business, antitrust, and illegal boycott. Plaintiffs pursued several theories of liability: participating in management of the boycott; serving as an "enforcer" or monitor; committing or threatening acts of violence, which showed that the perpetrator wanted the boycott to succeed by coercion when it could not succeed by persuasion; and as to Evers, threatening violence against boycott breakers, and as to the NAACP because he was its field secretary when he committed tortious and constitutionally unprotected acts. Damages for business losses during the boycott and injunctive relief were awarded.

49
The Court held that there could be no recovery based on intimidation by threats of social ostracism, because offensive and coercive speech is protected by the First Amendment. "The use of speeches, marches, and threats of social ostracism cannot provide the basis for a damages award. But violent conduct is beyond the pale of constitutional protection." 458 U.S. at 933, 102 S.Ct. 3409. There was some evidence of violence, but the violence was not pervasive as it had been in Milk Wagon Drivers Union Local 753 v. Meadowmoor Dairies, Inc., 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836 (1941). Accordingly, the Court made clear that only losses proximately caused by unlawful conduct could be recovered. Further, civil liability could not be imposed consistent with the First Amendment solely on account of an individual's association with others who have committed acts of violence; he must have incited or authorized them himself.

50
For the same reasons the Court held that liability could not be imposed on Evers for his participation in the boycott itself, or for his threats of vilification or ostracism. However, the merchants also sought damages from Evers for his speeches. He gave one in April 1966, and two others in April 1969. In the first, he told his audience that they would be watched and that blacks who traded with white merchants would be answerable to him; he also said that any "uncle toms" who broke the boycott would "have their necks broken" by their own people. In his April 19, 1969 speech, Evers stated that boycott violators would be "disciplined" by their own people and warned that the Sheriff could not sleep with boycott violators at night. And on April 21, Evers gave another speech to several hundred people calling for a total boycott of white-owned businesses and saying: "If we catch any of you going in any of them racist stores, we're gonna break your damn neck." The Court concluded that the "emotionally charged rhetoric" of Evers's speeches was within the bounds of Brandenburg. It was not followed by violence, and there was no evidence — apart from the speeches themselves — that Evers authorized, ratified, or directly threatened violence. "If there were other evidence of his authorization of wrongful conduct, the references to discipline in the speeches could be used to corroborate that evidence." Claiborne, 458 U.S. at 929, 102 S.Ct. 3409. As there was not, the findings were constitutionally inadequate to support the damages judgment against him and, in turn, the NAACP.

51
Claiborne, of course, did not arise under a threats statute. The Court had no need to consider whether Evers's statements were true threats of force within the meaning of a threats statute; it held only that his speeches did not incite illegal activity, thus could not have caused business losses and could not be the basis for liability to white merchants. As the opinion points out, there was no context to give the speeches (including the expression "break your neck") the implication of authorizing or directly threatening unlawful conduct. To the extent there was any intimidating overtone, Evers's rhetoric was extemporaneous, surrounded by statements supporting non-violent action, and primarily of the social ostracism sort. No specific individuals were targeted. For all that appears, "the break your neck" comments were hyperbolic vernacular. Certainly there was no history that Evers or anyone else associated with the NAACP had broken anyone's neck who did not participate in, or opposed, this boycott or any others. Nor is there any indication that Evers's listeners took his statement that boycott breakers' "necks would be broken" as a serious threat that their necks would be broken; they kept on shopping at boycotted stores.

52
Thus, Watts was the only Supreme Court case that discussed the First Amendment in relation to true threats before we first confronted the issue. Apart from holding that Watts's crack about L.B.J. was not a true threat, the Court set out no standard for determining when a statement is a true threat that is unprotected speech under the First Amendment. Shortly after Watts was rendered, we had to decide in Roy v. United States, 416 F.2d 874 (9th Cir.1969), whether a Marine Corps private made a true threat for purposes of 18 U.S.C. § 871 against the President, who was coming to his base the next day, by saying: "I am going to get him." We adopted a "reasonable speaker" test. As it has come to be articulated, the test is:

53
Whether a particular statement may properly be considered to be a threat is governed by an objective standard — whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault.

54
United States v. Orozco-Santillan, 903 F.2d 1262, 1265 (9th Cir.1990).

55
We have applied this test to threats statutes that are similar to FACE, see, e.g., United States v. Gilbert (Gilbert II), 884 F.2d 454, 457 (9th Cir.1989) (Fair Housing Act banning threat of force to intimidate person based on race and housing practices, 42 U.S.C. § 3631); United States v. Mitchell, 812 F.2d 1250, 1255 (9th Cir.1987) (threats against the President, 18 U.S.C. § 871); Merrill, 746 F.2d at 462-63 (same); United States v. Gordon, 974 F.2d 1110, 1117 (9th Cir.1992) (threat to kill a former President, 18 U.S.C. § 879); Orozco-Santillan, 903 F.2d at 1265 (threats to assault a law enforcement officer with intent to intimidate, 18 U.S.C. § 115); Melugin, 38 F.3d at 1483-84 (threat to influence judicial proceeding under Alaska state law); McCalden v. California Library Ass'n, 955 F.2d 1214, 1222 (9th Cir. 1990) (threat to disrupt conference under California's Unruh Act); and Lovell, 90 F.3d at 371 (9th Cir.1996) (§ 1983 action involving threat to shoot teacher). Other circuits have, too.7 We see no reason not to apply the same test to FACE.8

56
Under our cases, a threat is "an expression of an intention to inflict evil, injury, or damage on another." Gilbert II, 884 F.2d at 457; Orozco-Santillan, 903 F.2d at 1265. "Alleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." Orozco-Santillan, 903 F.2d at 1265; see also Mitchell, 812 F.2d at 1255 (citing Watts, 394 U.S. at 708, 89 S.Ct. 1399; Merrill, 746 F.2d at 462; Roy, 416 F.2d at 876). "`The fact that a threat is subtle does not make it less of a threat.'" Orozco-Santillan, 903 F.2d at 1265 (quoting Gilbert II, 884 F.2d at 457). A true threat, that is one "where a reasonable person would foresee that the listener will believe he will be subjected to physical violence upon his person, is unprotected by the first amendment." Id. (citing Merrill, 746 F.2d at 462).

57
It is not necessary that the defendant intend to, or be able to carry out his threat; the only intent requirement for a true threat is that the defendant intentionally or knowingly communicate the threat. Orozco-Santillan, 903 F.2d at 1265 n. 3; Gilbert II, 884 F.2d at 456-57; Mitchell, 812 F.2d at 1256 (upholding § 871 conviction of defendant with no capacity to carry out threat); Roy, 416 F.2d at 877.9 Other circuits are in accord.10 Nevertheless, we are urged to adopt a subjective intent requirement for FACE. In particular, amicus ACLU Foundation of Oregon, Inc., advocates a subjective intent component to "require evidence, albeit circumstantial or inferential in many cases, that the speaker actually intended to induce fear, intimidation, or terror; namely, that the speaker intended to threaten. If a person did not intend to threaten or intimidate (i.e., did not intend that his or her statement be understood as a threat), then the speech should not be considered to be a `true threat,' unprotected by the First Amendment." However, this much is subsumed within the statutory standard of FACE itself, which requires that the threat of force be made with the intent to intimidate. The "requirement of intent to intimidate serves to insulate the statute from unconstitutional application to protected speech." Gilbert I, 813 F.2d at 1529 (construing the Fair Housing Act's threat provision, 42 U.S.C. § 3631, which is essentially the same as FACE's). No reason appears to engraft another intent requirement onto the statute, because whether or not the maker of the threat has an actual intention to carry it out, "an apparently serious threat may cause the mischief or evil toward which the statute was in part directed." Gilbert II, 884 F.2d at 458 (quoting Roy, 416 F.2d at 877).

58
The dissents would change the test, either to require that the speaker actually intend to carry out the threat or be in control of those who will, or to make it inapplicable when the speech is public rather than private. However, for years our test has focused on what a reasonable speaker would foresee the listener's reaction to be under the circumstances, and that is where we believe it should remain. See Madsen, 512 U.S. at 773, 114 S.Ct. 2516 (noting that "threats ... however communicated, are proscribable under the First Amendment, and indicating that display of signs "that could be interpreted as threats or veiled threats" could be prohibited"). Threats are outside the First Amendment to "protect[] individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 388, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). This purpose is not served by hinging constitutionality on the speaker's subjective intent or capacity to do (or not to do) harm. Rather, these factors go to how reasonably foreseeable it is to a speaker that the listener will seriously take his communication as an intent to inflict bodily harm. This suffices to distinguish a "true threat" from speech that is merely frightening. Thus, no reasonable speaker would foresee that a patient would take the statement "You have cancer and will die within six months," or that a pedestrian would take a warning "Get out of the way of that bus," as a serious expression of intent to inflict bodily harm; the harm is going to happen anyway.

59
Neither do we agree that threatening speech made in public is entitled to heightened constitutional protection just because it is communicated publicly rather than privately. As Madsen indicates, threats are unprotected by the First Amendment "however communicated." Madsen, 512 U.S. at 753, 114 S.Ct. 2516.11

60
Therefore, we hold that "threat of force" in FACE means what our settled threats law says a true threat is: a statement which, in the entire context and under all the circumstances, a reasonable person would foresee would be interpreted by those to whom the statement is communicated as a serious expression of intent to inflict bodily harm upon that person. So defined, a threatening statement that violates FACE is unprotected under the First Amendment.

B

61
Although ACLA does not believe we should reach this point, if we do it submits that no claim was made out even under "true threats" cases. First, it argues that other threats cases were criminal actions against someone who made a real threat directly to others, not political speech as is the case here. It contrasts what it calls "a threat plus context" present in United States v. Dinwiddie, 76 F.3d 913 (8th Cir. 1996), and in other out-of-circuit cases,12 with the absence of a direct threat in this case. However, our cases do not require that the maker of the threat personally cause physical harm to the listener. In Orozco-Santillan, we made it clear that the speaker did not need to be able to carry out the threat. Likewise in Mitchell, the speaker could not possibly have done so. In Gilbert, the threatening letter mentions neither the intended victim nor who would carry out the threat. No case to our knowledge has imposed such a requirement,13 and we decline to now. It is the making of the threat with intent to intimidate — not the implementation of it — that violates FACE.

62
We do not understand Dinwiddie to hold anything different. Dinwiddie was also a civil suit under FACE. Mrs. Dinwiddie made comments to Crist outside his clinic, warning "Robert, remember Dr. Gunn ... This could happen to you ... He is not in the world anymore. Whoever sheds man's blood, by man his blood shall be shed." 76 F.3d at 917. She also said: "[Y]ou have not seen violence yet until you see what we do to you." Id. Writing for the Eighth Circuit, Judge Richard S. Arnold explained that in applying FACE's prohibition on using "threats of force," courts or juries must differentiate between "true threats" and protected speech. The alleged threat must be analyzed in light of its entire factual context to determine whether the recipient of the alleged threat could reasonably conclude that it expresses a determination or intent to injure presently or in the future. As outlined in the opinion, the Eighth Circuit considers a number of factors when deciding whether statements constitute threats of force: the reaction of the recipient and of other listeners, whether the threat was communicated directly to its victim, whether the maker of the threat had made similar statements to the victim in the past, and whether the victim had reason to believe that the maker had a propensity to engage in violence, but the list is not exhaustive and the presence or absence of any of these things is not dispositive. Id. at 925. The court concluded that although Mrs. Dinwiddie did not specifically say to Dr. Crist, "I am going to injure you," the statements in context, and Crist's reaction to them, show that they were "threats of force" that "intimidated" Crist. The court also noted that the fact that Mrs. Dinwiddie did not specifically say to Crist that she would injure him does not mean that her comments were not "threats of force." Id. at 925 n. 9. Accordingly, the court upheld an injunction ordering Mrs. Dinwiddie to stop violating FACE (which, as it pointed out, would have a de minimis effect on her ability to express herself) and approved the injunction's nationwide scope.

63
ACLA also maintains that "context" means the direct circumstances surrounding delivery of the threat, or evidence sufficient to resolve ambiguity in the words of the statement — not two weeks of testimony as occurred here in the district court. Otherwise, ACLA submits, FACE is facially invalid. However, none of our cases has limited "context" to explaining ambiguous words, or to delivery. We, and so far as we can tell, other circuits as well, consider the whole factual context and "all of the circumstances," Merrill, 746 F.2d at 462, in order to determine whether a statement is a true threat. ACLA points to United States v. Kelner, 534 F.2d 1020 (2d Cir.1976), but the Second Circuit's view is not to the contrary, as we noted in Lovell. Lovell, 90 F.3d at 372. The defendant in Kelner, who threatened to assassinate Yasser Arafat during a radio broadcast that also contained protected political expression, argued that this insulated his threat from prosecution; the court observed that this was not the case "[s]o long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." Kelner, 534 F.2d at 1027. In Kelner as well as in Lovell, the threatening statement was considered in context to determine if it were a true threat or not. See United States v. Malik, 16 F.3d 45, 50 (2d Cir.1994) (once there is sufficient extrinsic evidence to show that an ordinary and reasonable recipient would interpret letter as threat, case should go to the jury).

64
Indeed, context is critical in a true threats case and history can give meaning to the medium. Use of Ryder trucks — which the Eighth Circuit found to be a true threat in United States v. Hart, 212 F.3d 1067 (8th Cir.2000) — is an example that is strikingly similar to the use of "wanted"-type posters in this case. Hart, who was a known anti-abortion activist, parked two Ryder trucks in the driveways of an abortion clinic. He was prosecuted and convicted of violating FACE. The court held that Hart had threatened the clinic to intimidate it by using Ryder trucks, because a Ryder truck had been used in the Oklahoma City bombing of the Murrah Federal Building. Hart knew the clinicians knew this and would fear for their lives. Thus, use of the Ryder truck was a true threat. Like the poster format here, the Ryder truck in Hart was a symbol of something beyond the vehicle: there, a devastating bomb; in this case, murder.14

65
ACLA's contention that allowing consideration of context beyond the direct circumstances surrounding delivery of the words themselves creates a facial invalidity in FACE and the Hobbs Act is unavailing. Of the courts to consider the constitutionality of threats statutes, including the United States Supreme Court in Watts, all have upheld constitutionality and ACLA points to none that has disallowed consideration of context.15 This makes sense, because without context, a burning cross or dead rat mean nothing. In any event, the requirement of intent to intimidate cures whatever risk there might be of overbreadth.

66
Nor does consideration of context amount to viewpoint discrimination, as ACLA contends. ACLA's theory appears to be that because the posters did not contain any threat on their face, the views of abortion foes are chilled more than the views of abortion-right proponents because of the random acts of violence committed by some people against abortion providers. However, FACE itself is viewpoint neutral. See, e.g., United States v. Weslin, 156 F.3d 292, 296-97 (2d Cir.1998); United States v. Wilson, 154 F.3d 658, 663 (7th Cir.1998) ("The Act punishes anyone who engages in the prohibited conduct, irrespective of the person's viewpoint and does not target any message based on content. `The Access Act thus does not play favorites: it protects from violent or obstructive activity not only abortion clinics, but facilities providing pre-pregnancy and pregnancy counseling services, as well as facilities counseling alternatives to abortion.'") (quoting Terry v. Reno, 101 F.3d 1412, 1419 (D.C.Cir.1996)). Moreover, ACLA could not be liable under FACE unless it made a true threat with the intent to intimidate physicians. Thus it is making a threat to intimidate that makes ACLA's conduct unlawful, not its viewpoint.

67
Because of context, we conclude that the Crist and Deadly Dozen posters are not just a political statement. Even if the Gunn poster, which was the first "WANTED" poster, was a purely political message when originally issued, and even if the Britton poster were too, by the time of the Crist poster, the poster format itself had acquired currency as a death threat for abortion providers. Gunn was killed after his poster was released; Britton was killed after his poster was released; and Patterson was killed after his poster was released. Knowing this, and knowing the fear generated among those in the reproductive health services community who were singled out for identification on a "wanted"—type poster, ACLA deliberately identified Crist on a "GUILTY" poster and intentionally put the names of Hern and the Newhalls on the Deadly Dozen "GUILTY" poster to intimidate them. This goes well beyond the political message (regardless of what one thinks of it) that abortionists are killers who deserve death too.

68
The Nuremberg Files are somewhat different. Although they name individuals, they name hundreds of them. The avowed intent is "collecting dossiers on abortionists in anticipation that one day we may be able to hold them on trial for crimes against humanity." The web page states: "One of the great tragedies of the Nuremberg trials of Nazis after WWII was that complete information and documented evidence had not been collected so many war criminals went free or were only found guilty of minor crimes. We do not want the same thing to happen when the day comes to charge abortionists with their crimes. We anticipate the day when these people will be charged in PERFECTLY LEGAL COURTS once the tide of this nation's opinion turns against child-killing (as it surely will)." However offensive or disturbing this might be to those listed in the Files, being offensive and provocative is protected under the First Amendment. But, in two critical respects, the Files go further. In addition to listing judges, politicians and law enforcement personnel, the Files separately categorize "Abortionists" and list the names of individuals who provide abortion services, including, specifically, Crist, Hern, and both Newhalls. Also, names of abortion providers who have been murdered because of their activities are lined through in black, while names of those who have been wounded are highlighted in grey. As a result, we cannot say that it is clear as a matter of law that listing Crist, Hern, and the Newhalls on both the Nuremberg Files and the GUILTY posters is purely protected, political expression.

69
Accordingly, whether the Crist Poster, the Deadly Dozen poster, and the identification of Crist, Hern, Dr. Elizabeth Newhall and Dr. James Newhall in the Nuremberg Files as well as on "wanted"-type posters, constituted true threats was properly for the jury to decide.

C

70
ACLA next argues that the true threat instructions require reversal because they permitted consideration of motive, history of violence including the violent actions of others, and the defendants' subjective motives as part of context. We have already explained why it is proper for the whole factual context and all the circumstances bearing on a threat to be considered. The court also instructed the jury to consider evidence presented by the defense of non-violence and permissive exercise of free speech. That the contextual facts may have included the violent actions of others does not infect the instruction, because the issue is whether a reasonable person should have foreseen that the Crist Guilty Poster, the Deadly Dozen Poster, and the Nuremberg Files, would be interpreted as a serious threat of harm by doctors who provide abortions and were identified on them.

71
ACLA also contends that the district court employed the wrong standard of intent, allowing the jury to find in physicians' favor regardless of ACLA's subjective intent. The court instructed: "A statement is a `true threat' when a reasonable person making the statement would foresee that the statement would be interpreted by those to whom it is communicated as a serious expression of an intent to bodily harm or assault." This language is taken from Orozco-Santillan, 903 F.2d at 1265, is an accurate statement of our law, and is faithful to the objective standard we use for determining whether a statement is a true threat. For reasons we have already explained, we decline to read into FACE (or the Hobbs Act) a specific intent to threaten violence or to commit unlawful acts in addition to the intent to intimidate which the statute itself requires.

72
ACLA additionally faults the court for failing to provide any standard of intent because the elements instruction merely states that FACE is violated by "a threat of force to intimidate or interfere with, or attempt to intimidate or interfere with" physicians' ability to provide reproductive health services. As best we can tell, this boils down to a complaint that the instruction did not say "in order to" between "threat of force" and "to intimidate." However, this is the plain import of the instruction.

73
ACLA further suggests that the conspiracy instruction, combined with the "attempt to intimidate" instruction, could have resulted in liability for an "attempt to threaten" without proof of an actual threat.16 We do not see how, because the jury had to find a true threat before reaching any other FACE or RICO issues. ACLA also posits that the standard form instruction, "[i]f you find a defendant was a member of a conspiracy, that defendant is responsible for what other conspirators said or did to carry out the conspiracy, whether or not that defendant knew what they said or did," had the effect in this case of violating the rule of Claiborne that one cannot be held accountable for the speech of others by reason of mere association, absent ratification or adoption of it. However, the jury was instructed that a person does not become a conspirator merely by associating with one or more persons who are conspirators; rather, one becomes a member of a conspiracy by willfully participating in an unlawful plan with the intent to advance or further some object or purpose of it. There is no right to associate with others to engage in activities that are unlawful and unprotected by the First Amendment, as the making of true threats to intimidate providers of reproductive health services is. Madsen, 512 U.S. at 776, 114 S.Ct. 2516 (upholding injunction restraining abortion protestors acting in concert with defendants). The Seventh Circuit had occasion to consider (and reject) a similar argument made by abortion protestors who had been convicted of conspiring to violate FACE in United States v. Wilson, 154 F.3d 658, 666-67 (7th Cir.1998). It explained that the Supreme Court in Claiborne was referring to individuals who were engaging in a peaceful protest and thus were properly exercising their First Amendment rights, whereas FACE is aimed at those who themselves intend to intimidate and thereby deprive others of their lawful rights. As in Wilson, we are not persuaded that the instructions allowed any defendant in this case to be found liable for threats to intimidate for which he or she was not responsible. They either participated in making them, or agreed that they should be made.

74
Finally, we note that the jury was instructed that "[e]ven speech that is coercive may be protected if the speaker refrains from violence or from making a true threat. Moreover, the mere abstract teaching of the moral propriety or even moral necessity for resort to force and violence is protected speech under the First Amendment." It was reminded that "plaintiffs' claims are based only on the three statements I have listed for you," and that it should determine the case as to each defendant and each claim separately. Accordingly, the court did not abuse its discretion in formulating the instructions, nor was the jury incorrectly instructed as a matter of law on true threats or the elements of FACE.17

D

75
ACLA joins in Treshman's assertion that the court erroneously admitted prejudicial evidence by permitting: an FBI agent and two federal marshals to testify that the FBI and the Justice Department considered ACLA's two posters to be "serious threats"; references to non-party violence; introduction of defendants' arrests; physicians' counsel to tell the jury about Bray's invocations of the Fifth Amendment through a summary of his deposition; references to actions of certain defendants and non-parties on the abortion debate and to such things as the signing of "Defensive Action petitions" by five or six of the individual defendants; an exhibit with Rev. Sullivan's hearsay opinion that ACLA is a "cancer" which prolifers must "cut out immediately" before it "destroys the pro-life movement" to remain in the exhibit books; and by permitting deposition summaries to be introduced. ACLA recognizes that evidentiary rulings are normally reviewed for an abuse of discretion, but argues that in cases raising First Amendment issues appellate courts must independently examine the record for evidentiary errors which penalize political speech or allow "a forbidden intrusion on the field of free expression." Milkovich v. Lorain Journal Co., 497 U.S. 1, 17, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (citation omitted). We decline ACLA's invitation to review evidentiary rulings de novo. No case of which we are aware suggests that the obligation to examine the record independently extends so far. Nor do we believe that appellate judges should retry cases, as ACLA's proposal would have us do. Accordingly, we review the district court's evidentiary rulings in this case, as we do evidentiary rulings in all cases, for abuse of discretion. None appears.

76
Testimony about the law enforcement officers' response to the Crist and Deadly Dozen "GUILTY" posters had some tendency to show the physicians' state of mind when they found out they were named on "wanted"-type posters, as well as to show the knowledge and intent of ACLA in distributing the posters regardless of the reaction they precipitated. Both are non-hearsay purposes. No testimony was allowed about what officers thought the posters meant. That FBI agents and United States Marshals advised physicians to take security precautions relates to how Crist, Hern, and the Newhalls perceived their own safety. The court admonished the jury that it should not conclude that these agencies had decided that the threats were "true threats." We assume that the jury followed the court's limiting instruction, Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899-900 (9th Cir.1996), which cured whatever potential there may have been for an unduly prejudicial effect from admission of this testimony.

77
ACLA's knowledge of prior violence and its effect on reproductive health services providers bore directly on its intent to intimidate physicians, and was limited by the district court to that relevant purpose. Bray's invocation of the Fifth Amendment was not improperly admitted as to him in a civil trial. SEC v. Colello, 139 F.3d 674, 677 (9th Cir.1998). Co-conspirator statements were admissible so long as they were connected to the conspiracy and the jury found that the statements were made in furtherance of it. The same is true of the Defensive Action petitions, which were clearly admissible against those defendants who signed them and as to others with whom the signatories were conspiring. Speech does not become inadmissible to show context or intent simply because standing alone it is protected. Wisconsin v. Mitchell, 508 U.S. 476, 489-90, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993) (First Amendment does not prohibit evidentiary use of speech to show motive or intent); Dinwiddie, 76 F.3d at 918, 925, n. 10 (although advocacy of view that violence is justifiable is protected, it was appropriate for district court to consider plaintiff's awareness of defendant's advocacy of lethal force in determining whether defendant intimidated him with threats of force). Terry Sullivan was a the Chicago meeting that led to the founding of ACLA, and to the extent that he expressed any opinion about how ACLA was undermining a commitment to nonviolence, it was part of what happened at the time, was relevant to show that ACLA knew how its actions were being interpreted, and was within the district court's discretion to admit once Sullivan's testimony had laid a foundation. Neither Sullivan nor Flip Benham was available to testify at trial; as both had been examined at a deposition, their former testimony was not excluded by the hearsay rule, Fed.R.Evid. 804(b), and its presentation in the form of summaries was within the court's discretion under Rule 611(a). Oostendorp v. Khanna, 937 F.2d 1177, 1180 (7th Cir.1991) (requiring deposition summaries not an abuse of discretionary authority to regulate conduct of civil trials); Walker v. Action Indus., Inc., 802 F.2d 703, 712 (4th Cir.1986) (same); Kingsley v. Baker/Beech Nut Corp., 546 F.2d 1136, 1141 (5th Cir.1977) (same); MANUAL FOR COMPLEX LITIGATION, Third, § 22.331 (1995).18

E

78
ACLA also joins Treshman's argument that mistrials should have been granted because a juror objected to use of the word "abortionist"; the judge made a remark about Bill Clinton in admonishing a witness to tell the truth; jurors were invited to watch a criminal sentencing proceeding; three jurors had a conversation with one of the physicians during a lunch hour; and physicians' counsel likened defendants to the Oklahoma City and World Trade Center bombers and Islamic terrorists during his closing. We are asked to review the record de novo on this issue as well, although ACLA acknowledges that the normal standard for refusing to grant mistrials is abuse of discretion. We decline to change our standard, and see no reversible error.

79
When a juror informed the court that the defense's use of the term "abortionist" was becoming distracting, the district court instructed the jury that "[i]t is perfectly legal, and proper, and within any free speech right, for one group, that is opposing another group, to refer to them in the terms they choose. And it's clear the pro-life people, traditionally, I believe, call abortion providers abortionists. So, there should not be any adverse reaction to these people using the lingo and terminology of their protest." The jurors all responded that they could live with that, and keep an open mind with respect to all the evidence. There was no objection to the process, and no abuse of discretion on account of taking no further action. Similarly, after learning of a chance encounter in the courthouse elevator between Elizabeth Newhall and three jurors in the presence of defense counsel, the court inquired whether the jurors had discussed anything substantive and whether their judgment would be impaired by the contact. They responded negatively and the court acted within its discretion in taking no further action. The court also instructed that anything the jury may have seen or heard when the court was not in session is not evidence, and that the case was to be decided solely on the evidence received at trial. Finally, ACLA fails to explain why allowing the jurors to watch two sentencing proceedings was objectionable or prejudicial, and we cannot see how it was.

80
The judge himself recognized that his Clinton reference was inappropriate. He apologized to the jury about it, and explained that the court was attempting to suggest to the witness that she should just go ahead and answer a question. (The witness had remarked to counsel after being impeached with a prior inconsistent statement under oath, "I am not sure what you mean by truthful.") The judge told jurors to put his comment out of their minds, permitted the defense to re-open direct examination to allow the witness to explain her prior answer, and told the jury again in his final instructions that any remarks of his were not to be taken as an indication of how much weight to give the testimony of any witness. Whatever the impropriety, it was cured.

81
As might be expected, closing argument was robust on both sides; the court gave all counsel considerable latitude. Images of famous and infamous figures alike were evoked. The district judge was in the best position to decide whether any particular reference went too far. The court reminded the jury that counsels' statements were not evidence, and we cannot say that the defense was so prejudiced by the argument that a mistrial should have been granted.

F

82
Having concluded that "threat of force" was properly defined and that no trial error requires reversal, we consider whether the core constitutional fact — a true threat — exists such that the Crist and Deadly Dozen Posters, and the Nuremberg Files as to Crist, Hern, and the Newhalls, are without First Amendment protection. The task in this case does not seem dramatically different from determining that the issue should have gone to the jury and that the jury was properly instructed under FACE. Nevertheless, we review the evidence on true threats independently.

83
The true threats analysis turns on the poster pattern. Neither the Crist poster nor the Deadly Dozen poster contains any language that is overtly threatening. Both differ from prior posters in that the prior posters were captioned "WANTED" while these are captioned "GUILTY." The text also differs somewhat, but differences in caption or words are immaterial because the language itself is not what is threatening. Rather, it is use of the "wanted"-type format in the context of the poster pattern — poster followed by murder — that constitutes the threat. Because of the pattern, a "wanted"-type poster naming a specific doctor who provides abortions was perceived by physicians, who are providers of reproductive health services, as a serious threat of death or bodily harm. After a "WANTED" poster on Dr. David Gunn appeared, he was shot and killed. After a "WANTED" poster on Dr. George Patterson appeared, he was shot and killed. After a "WANTED" poster on Dr. John Britton appeared, he was shot and killed. None of these "WANTED" posters contained threatening language, either. Neither did they identify who would pull the trigger. But knowing this pattern, knowing that unlawful action had followed "WANTED" posters on Gunn, Patterson and Britton, and knowing that "wanted" type posters were intimidating and caused fear of serious harm to those named on them, ACLA published a "GUILTY" poster in essentially the same format on Dr. Crist and a Deadly Dozen "GUILTY" poster in similar format naming Dr. Hern, Dr. Elizabeth Newhall and Dr. James Newhall because they perform abortions. Physicians could well believe that ACLA would make good on the threat. One of the other doctors on the Deadly Dozen poster had in fact been shot before the poster was published. This is not political hyperbole. Nor is it merely "vituperative, abusive, and inexact." Watts, 394 U.S. at 708, 89 S.Ct. 1399 (comparing language used in political arena to language used in labor disputes). In the context of the poster pattern, the posters were precise in their meaning to those in the relevant community of reproductive health service providers. They were a true threat.

84
The posters are a true threat because, like Ryder trucks or burning crosses, they connote something they do not literally say, yet both the actor and the recipient get the message. To the doctor who performs abortions, these posters meant "You're Wanted or You're Guilty; You'll be shot or killed." This was reinforced by the scorecard in the Nuremberg Files. The communication was not conditional or casual. It was specifically targeted. Crist, Hern, and the Newhalls, who performed abortions, were not amused. Cf. Watts, 394 U.S. at 708, 89 S.Ct. 1399 (no true threat in political speech that was conditional, extemporaneous, and met with laughter); Claiborne, 458 U.S. at 928, 102 S.Ct. 3409 (spontaneous and emotional appeal in extemporaneous speech protected when lawless action not incited).

85
The "GUILTY" posters were publicly distributed, but personally targeted. While a privately communicated threat is generally more likely to be taken seriously than a diffuse public one, this cannot be said of a threat that is made publicly but is about a specifically identified doctor and is in the same format that had previously resulted in the death of three doctors who had also been publicly, yet specifically, targeted. There were no individualized threats in Brandenburg, Watts or Claiborne. However, no one putting Crist, Hern, and the Newhalls on a "wanted"-type poster, or participating in selecting these particular abortion providers for such a poster or publishing it, could possibly believe anything other than that each would be seriously worried about being next in line to be shot and killed. And they were seriously worried.

86
As a direct result of having a "GUILTY" poster out on them, physicians wore bullet-proof vests and took other extraordinary security measures to protect themselves and their families. ACLA had every reason to foresee that its expression of intent to harm (the "GUILTY" poster identifying Crist, Hern, Elizabeth Newhall and James Newhall by name and putting them in the File that tracks hits and misses) would elicit this reaction. Physicians' fear did not simply happen; ACLA intended to intimidate them from doing what they do.

87
This is the point of the statute and is conduct that we are satisfied lacks any protection under the First Amendment.

88
Violence is not a protected value. Nor is a true threat of violence with intent to intimidate. ACLA may have been staking out a position for debate when it merely advocated violence as in Bray's A Time to Kill, or applauded it, as in the Defense Action petitions. Likewise, when it created the Nuremberg Files in the abstract, because the First Amendment does not preclude calling people demeaning or inflammatory names, or threatening social ostracism or vilification to advocate a political position. Claiborne, 458 U.S. at 903, 909-12, 102 S.Ct. 3409. But, after being on "wanted"-type posters, Dr. Gunn, Dr. Patterson, and Dr. Britton can no longer participate in the debate. By replicating the poster pattern that preceded the elimination of Gunn, Patterson and Britton, and by putting Crist, Hern, and the Newhalls in an abortionists' File that scores fatalities, ACLA was not staking out a position of debate but of threatened demise. This turns the First Amendment on its head.

89
Like "fighting words," true threats are proscribable. We therefore conclude that the judgment of liability in physicians' favor is constitutionally permissible.

IV

90
ACLA submits that the damage award must be reversed or limited to the compensatory damages because the punitive award amounts to judgment without notice contrary to BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). We have since discussed the subject in depth in In re Exxon Valdez, 270 F.3d 1215, 1241 (9th Cir.2001). Although our review is de novo, the district court should be given the opportunity to evaluate the punitive damages award and to make findings with respect to its propriety. Therefore, we vacate the award of punitive damages and remand for the district court to consider in the first instance whether the award is appropriate in light of Exxon Valdez.

V

91
After trial, the district court found that each defendant used intimidation as a means of interfering with the provision of reproductive health services and acted with malice and with specific intent in threatening physicians. It found that physicians remain threatened by ACLA's threats, and have no adequate remedy at law. The court concluded that physicians had proved by clear and convincing evidence that each defendant acting independently and as a co-conspirator prepared and published the Deadly Dozen Poster, the Crist Poster, and the Nuremberg Files with specific intent to make true threats to kill or do bodily harm to physicians, and to intimidate them from engaging in legal medical practices. It "totally reject[ed] the defendants' attempts to justify their actions as an expression of opinion or as a legitimate and lawful exercise of free speech in order to dissuade the plaintiffs from providing abortion services." PPCW III, 41 F.Supp.2d at 1154. Applying Madsen's standard, the court found that ACLA's actions were not protected under the First Amendment. Accordingly, it permanently enjoined each of the defendants, their agents, and all persons in active concert with any of them who receive actual notice, from threatening, with the specific intent to do so, Crist, Hern, Dr. Elizabeth Newhall, Dr. James Newhall, PPCW and PFWHC in violation of FACE; publishing, republishing, reproducing or distributing the Deadly Dozen Poster, or the Crist poster, or their equivalent, with specific intent to threaten physicians, PPCW or PFWHC; and from providing additional material concerning Crist, Hern, either Newhall, PPCW or PFWHC to the Nuremberg Files or any mirror web site with a specific intent to threaten, as well as from publishing the personally identifying information about them in the Nuremberg Files with a specific intent to threaten. The court also ordered ACLA to turn over possession of materials that are not in compliance with the injunction.

92
ACLA complains principally about the restraint on possessing the posters. Pointing to Stanley v. Georgia, 394 U.S. 557, 567, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), where the Court observed that "the State may no more prohibit mere possession of obscene matter on the ground that it may lead to antisocial conduct than it may prohibit possession of chemistry books on the ground that they may lead to the manufacture of homemade spirits," ACLA contends that the injunction treats the posters worse than obscenity. However, the posters in this case are quite different from a book; the "wanted" — type posters themselves — not their ideological content — are the tool for threatening physicians. In this sense the posters' status is more like conduct than speech. Cf. United States v. O'Brien, 391 U.S. 367, 376-82, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (explaining distinction between speech and conduct, and holding that expressive aspect of conduct does not exempt it from warranted regulation). The First Amendment interest in retaining possession of the threatening posters is de minimis, while ACLA's continued possession of them constitutes part of the threat. The court heard all the evidence, which included testimony that some defendants obstructed justice and ignored injunctions. Accordingly, we cannot say that the turn-over order was broader than necessary to assure that this particular threat will not be used again.

93
ACLA also suggests that the injunction is an improper prior restraint on speech because it prohibits dissemination of the posters. It is not. The Supreme Court has rejected the notion that all injunctions which incidentally affect expression are prior restraints. Madsen, 512 U.S. at 764 n. 2, 114 S.Ct. 2516; Schenck v. Pro-Choice Network of Western New York, 519 U.S. 357, 374 n. 6, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997). Like Madsen and Schenck, the injunction here was not issued because of the content of ACLA's expression, but because of prior unlawful conduct.

94
The terms of the injunction are finely tuned and exceedingly narrow. Only threats or use of the posters or their equivalent with the specific intent to threaten Crist, Hern, either Newhall, PPCW or PFWHC are prohibited. Only personal information about these particular persons may not be used in the Nuremberg Files with the specific intent to threaten them. This leaves huge room for ACLA to express its views.19

CONCLUSION

95
A "threat of force" for purposes of FACE is properly defined in accordance with our long-standing test on "true threats," as "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." This, coupled with the statute's requirement of intent to intimidate, comports with the First Amendment.

96
We have reviewed the record and are satisfied that use of the Crist Poster, the Deadly Dozen Poster, and the individual plaintiffs' listing in the Nuremberg Files constitute a true threat. In three prior incidents, a "wanted"-type poster identifying a specific doctor who provided abortion services was circulated, and the doctor named on the poster was killed. ACLA and physicians knew of this, and both understood the significance of the particular posters specifically identifying each of them. ACLA realized that "wanted" or "guilty" posters had a threatening meaning that physicians would take seriously. In conjunction with the "guilty" posters, being listed on a Nuremberg Files scorecard for abortion providers impliedly threatened physicians with being next on a hit list. To this extent only, the Files are also a true threat. However, the Nuremberg Files are protected speech.

97
There is substantial evidence that these posters were prepared and disseminated to intimidate physicians from providing reproductive health services. Thus, ACLA was appropriately found liable for a true threat to intimidate under FACE.

98
Holding ACLA accountable for this conduct does not impinge on legitimate protest or advocacy. Restraining it from continuing to threaten these physicians burdens speech no more than necessary.

99
Therefore, we affirm the judgment in all respects but for punitive damages, as to which we remand.

100
AFFIRMED IN PART; VACATED AND REMANDED IN PART.

Notes:

*
Judges KOZINSKI and O'SCANNLAIN voted to grant

1
We refer collectively to the plaintiffs as "physicians" unless reference to a particular party is required. In addition to FACE, the case went to trial on claims that the same conduct violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962 (except that ACLA was alleged to be the RICO enterprise and was not a defendant on this claim), and on claims that the defendants conspired to violate FACE and RICO. As each claim turns on whether there were true threats without constitutional protection, the appeal and our opinion focus only on FACE

2
Michael Bray, Andrew Burnett, David A. Crane, Timothy Paul Dreste, Joseph L. Foreman, Stephen P. Mears, Monica Migliorino Miller, Catherine Ramey, Dawn Marie Stover, Donald Treshman, and Charles Wysong. We refer to them collectively as "ACLA."

3
The court had previously denied ACLA's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)Planned Parenthood of the Columbia/Willamette, Inc. v. ACLA (PPCW I), 945 F.Supp. 1355 (D.Or.1996).

4
On the FACE claims, the jury awarded $39,656 to Crist, $14,429 to Hern, $15,797.98 to Elizabeth Newhall, $375 to James Newhall, $405,834.86 to PPCW, and $50,243 to PFWHC from each defendant as compensatory damages and $14.5 million to Crist, $13 million to Hern, $14 million to Elizabeth Newhall, $14 million to James Newhall, $29.5 million to PPCW, and $23.5 million to PFWHC in punitive damages. On the RICO claims (after trebling), Crist was awarded $892,260; Hern, $324,657; Elizabeth Newhall, $355,454; James Newhall, $8,442; PPCW $9,131,280; and PFWHC, $1,130,466

5
Treshman and Miller filed a separate brief. We treat their arguments with ACLA's, as each adopts the others' brief. An amicus curiae brief in support of reversal was also submitted on behalf of The Thomas Jefferson Center for the Protection of Free Expression. Paul deParrie submitted a pro se, non-party-in-interest brief challenging the permanent injunction entered by the district court, and an amicus brief in opposition to reconsideration of the panel opinion

6
Amicus briefs in support of affirmance were submitted on behalf of the American Medical Association; seventeen United States Senators and forty-two United States Representatives; the State of Connecticut; the Anti-Defamation League, the American Jewish Committee, and Hadassah, the Women's Zionist Organization of America, Inc.; Feminist Majority Foundation, Center for Reproductive Law and Policy, National Abortion and Reproductive Rights Action League and NARAL Foundation, National Abortion Federation, National Coalition of Abortion Providers, National Organization for Women Foundation, NOW Legal Defense and Education Fund, National Women's Health Foundation, Northwest Women's Law Center, Physicians for Reproductive Choice and Health, and Women's Law Project; and the ACLU Foundation of Oregon, Inc

7
See, e.g., United States v. Whiffen, 121 F.3d 18, 20-21 (1st Cir.1997) (statement is threat under 18 U.S.C. § 875(c) if reasonable person would foresee that it would be interpreted as expression of intent to harm); United States v. Sovie, 122 F.3d 122, 125 (2d Cir.1997) (Second Circuit approach to threats, adopted in United States v. Kelner, 534 F.2d 1020 (2d Cir.1976), is objective test and requires assessing whether a reasonable recipient of statement would construe it as threat in light of context); United States v. Kosma, 951 F.2d 549, 556-57 (3d Cir.1991) (statement is threat under 18 U.S.C. § 871 if reasonable person would foresee that it would be interpreted as expression of intent to harm); United States v. Darby, 37 F.3d 1059, 1066 (4th Cir.1994) (statement is threat under 18 U.S.C. § 875(c) if reasonable person would interpret the statement as threat); United States v. Morales, 272 F.3d 284, 287 (5th Cir.2001) (statement is threat under 18 U.S.C. § 875(c) if recipient placed in reasonable fear of bodily harm); United States v. Landham, 251 F.3d 1072, 1080 (6th Cir.2001) (statement is threat under 18 U.S.C. § 875(c) if reasonable recipient of message would interpret it as expression of intent to harm); United States v. Hartbarger, 148 F.3d 777, 782-83 (7th Cir.1998) (cross burning is threat under 42 U.S.C. § 3631 because the reasonable person would foresee that it would be interpreted as expression of intent to harm); United States v. Hart, 212 F.3d 1067, 1072 (8th Cir.2000) (placing Ryder truck in driveway of abortion clinic is threat under FACE because, in light of entire factual context, person would reasonably conclude that the act expresses an intent to harm); United States v. Magleby, 241 F.3d 1306, 1311-13 (10th Cir.2001) (cross burning is threat under the Fair Housing Act, 42 U.S.C. § 3631, because reasonable person would foresee that it would be interpreted as expression of intent to harm); United States v. Callahan, 702 F.2d 964, 965-66 (11th Cir.1983) (statement is threat under 18 U.S.C. § 871 if reasonable person would construe statement as expression of intent to harm); Metz v. Dep't of Treasury, 780 F.2d 1001, 1002 (Fed.Cir. 1986) (threat evaluated by reasonable listener considering numerous factors).
Although all now apply an objective standard, several circuits have a "reasonable listener" test while others have a "reasonable speaker" test as we do. The difference does not appear to matter much because all consider context, including the effect of an allegedly threatening statement on the listener.

8
Both the House and Senate specifically referred toGilbert's interpretation of the Fair Housing Act's threat provision in adopting FACE's quite similar text. H. Rep. No. 103-306, 12 n. 19 (1993), 1994 U.S. Code Cong. & Admin. News at 699, 709 n. 19; S.Rep. No. 103-117, at 29 (1993).

9
We have held that 28 U.S.C. § 876, which criminalizes knowingly mailing any communication containing a threat to injure, is a specific intent crimeUnited States v. Twine, 853 F.2d 676 (9th Cir.1988); United States v. King, 122 F.3d 808 (9th Cir.1997). However, we were not defining "threat" or considering what a true threat is, and we made it clear that specific intent or ability to carry out the threat is not an essential element. King, 122 F.3d at 810 (quoting Twine, 853 F.2d at 681 n. 4).

10
See, e.g., United States v. Francis, 164 F.3d 120, 123 (2d Cir.1999) (rejecting addition of substantive intent requirement to objective test); United States v. Miller, 115 F.3d 361, 363-64 (6th Cir.1997) (same); United States v. Aman, 31 F.3d 550, 553-56 (7th Cir.1994) (same); United States v. Patrick, 117 F.3d 375, 377 (8th Cir.1997) (same); United States v. Martin, 163 F.3d 1212, 1215-16 (10th Cir. 1998) (same). But see United States v. Patillo, 438 F.2d 13, 15 (4th Cir.1971) (including subjective intent element in § 871). The Fourth Circuit has abandoned this approach in its other true threat cases.

11
Judge Reinhardt chides us for failing to accord public speech more protection than private speech. He misses the pointThreats, in whatever forum, may be independently proscribed without implicating the First Amendment. See e.g., Schenck v. Pro-Choice Network of Western New York, 519 U.S. 357, 373, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (so indicating in case involving public protest against abortion providers); Madsen, 512 U.S. at 774, 114 S.Ct. 2516 (same); Kelner, 534 F.2d 1020 (JDL press conference in connection with public demonstration about the Palestine Liberation Organization and its leader); Hart, 212 F.3d 1067 (public protest against abortion providers).
Nor does Bauer v. Sampson, 261 F.3d 775 (9th Cir.2001), turn on a public/private distinction, as Judge Kozinski's dissent suggests. No heightened scrutiny was given to the professor's speech on account of the fact that it had to do with a campus debate. Rather, the Orozco-Santillan test was applied, and we concluded that even though there was some violent content to his writings and cartoons, in the context of the underground campus newspaper in which they appeared, they would be perceived as hyperbole instead of as a serious expression of intent to inflict bodily harm.

12
It relies onUnited States v. Viefhaus, 168 F.3d 392 (10th Cir.1999) (threat that bomb will be activated in 15 pre-selected major cities); United States v. Schiefen, 139 F.3d 638 (8th Cir.1998) (personal letter sent to judge); United States v. Khorrami, 895 F.2d 1186 (7th Cir.1990) (telephone calls and wanted posters sent directly to Jewish National Fund stating "death to the Fucking JNF"); United States v. Cooper, 865 F.2d 83 (4th Cir.1989) (scoping out areas in Washington, D.C. to blow Rajiv Gandhi's brains out); United States v. Kosma, 951 F.2d 549 (3d Cir.1991) (threat that 21 guns are going to put bullets through President Reagan's heart and brain); United States v. Kelner, 534 F.2d 1020 (2d Cir.1976) (statement over radio that people are trained who are out now and intend to make sure that Arafat is assassinated); United States v. Sovie, 122 F.3d 122 (2d Cir.1997) (reiterating Second Circuit test that "true threat" is one that "on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution"); United States v. Fulmer, 108 F.3d 1486 (1st Cir.1997) (silver bullets are coming; considered in context, appeared to be a threat).

13
To the contrary, inViefhaus, for example, the threat consisted of a hotline message from an unnamed person that violent acts would be executed by unnamed persons. In Khorrami, the purveyor of a "Crimes Against Humanity" poster made no statement that he would be the one to implement the threat. And in United States v. Bellrichard, 994 F.2d 1318 (8th Cir.1993), letters warned that God or unnamed parties would kill the addressees. The same is true of Kelner, where the court noted that it was not necessary under § 875(c) (prescribing a communication containing a threat) for the government to prove that Kelner had a specific intent or a present ability to carry out his threat. 534 F.2d at 1023.

14
See also, e.g., United States v. Magleby, 241 F.3d 1306 (10th Cir.2001) (cross burning).

15
See, e.g., United States v. Weslin, 156 F.3d 292 (2d Cir.1998); United States v. Wilson, 154 F.3d 658 (7th Cir.1998); United States v. Bird, 124 F.3d 667 (5th Cir.1997); Hoffman v. Hunt, 126 F.3d 575 (4th Cir.1997); Terry v. Reno, 101 F.3d 1412 (D.C.Cir.1996); United States v. Soderna, 82 F.3d 1370 (7th Cir.1996); Dinwiddie, 76 F.3d 913; Cheffer v. Reno, 55 F.3d 1517 (11th Cir.1995).

16
ACLA argues more broadly that no claim for conspiracy to violate FACE exists, but we decline to consider the issue because it is raised for the first time on appealLos Angeles News Serv. v. Reuters Television Int'l Ltd., 149 F.3d 987, 996 (9th Cir.1998). It had every opportunity to assert this view in the district court before judgment, having moved to dismiss, for summary judgment, and for judgment as a matter of law as well as having objected to proposed instructions (but not on conspiracy). Failing to raise the issue until now, absent any exceptional circumstances or change in the law, prejudices both the plaintiffs and the process. Considerable time and resources were devoted to litigating these claims to verdict. In any event, we cannot see that substantial injustice occurred. FACE came into being in part because of "organized," "concerted" campaigns by "groups" to disrupt access to reproductive health services, S.Rep. No. 103-117, at 6-7 (1993), and the instruction effectively channeled the jury away from finding defendants liable for mere association and instead required it to find that each defendant threatened physicians intending to intimidate them or willfully joined with others to do so. See Madsen v. Women's Health Center, Inc., 512 U.S. 753, 776, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (freedom of association protected by First Amendment does not extend to joining with others for the purpose of depriving third parties of their lawful rights).

17
ACLA cites other errors in the Hobbs Act and RICO instructions but offers no authority in support. Neither does it indicate that any objection on these issues was preserved. Its argument on appeal is not developed. In any event, the instructions appear to track model instructions and are not obviously wrong. For these reasons, we do not discuss these challenges and summarily reject them
ACLA also contends that the court compromised its right to a fair trial by telling the jury that the United States Supreme Court has declared that women have a constitutional right to abortion, and no one is permitted to violate the law because of their views about abortion. It objected on the ground that the charge was "death to us" but makes no substantial argument on appeal why there was reversible error on this account. We summarily reject this argument as well.

18
After noting that the decision to admit deposition testimony at all is within the sound discretion of the district court, Judge Flaum explained inOostendorp:
It follows that the court may control the manner in which deposition testimony is presented; indeed, trial courts are charged to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth [and to] avoid needless consumption of time...." Fed.R.Evid. 611(a). The district court adopted its rule to serve these objectives, and we agree that requiring deposition summaries can be a reasonable means of implementing the mandate of Rule 611. We therefore conclude that the district court's requirement was not an abuse of its discretionary authority to regulate the conduct of civil trials.
Oostendorp, 937 F.2d at 1179-80.
We hold only, for these reasons, that the district court did not abuse its discretion in requiring summaries in lieu of transcripts. As there was no challenge along the lines of Judge Berzon's dissent to the particular summaries that were presented, we have no occasion to consider whether the court did or did not err in receiving them.

19
Assuming that he has standing, deParrie's challenges fail for most of the same reasons. The district court found that he was an employee and agent of ALM and it is proper for the injunction to apply to him as well. Fed. R.Civ.P. 65

101
REINHARDT, Circuit Judge, with whom KOZINSKI, KLEINFELD, and BERZON, Circuit Judges, join, dissenting:

102
I concur fully in both Judge Kozinski's and Judge Berzon's dissents. The differences between the majority and dissenting opinions with respect to the First Amendment are clear. I write separately to emphasize one point: the majority rejects the concept that speech made in a political forum on issues of public concern warrants heightened scrutiny. See Majority Op. at 1076. This rejection, if allowed to stand, would significantly weaken the First Amendment protections we now enjoy. It is a fundamental tenet of First Amendment jurisprudence that political speech in a public arena is different from purely private speech directed at an individual. See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 926-27, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); Watts v. United States, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969); New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Terminiello v. City of Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). Political speech, ugly or frightening as it may sometimes be, lies at the heart of our democratic process. Private threats delivered one-on-one do not. The majority's unwillingness to recognize the difference is extremely troublesome. For this reason alone, I would be compelled to dissent.

103
KOZINSKI, Circuit Judge, with whom Circuit Judges REINHARDT, O'SCANNLAIN, KLEINFELD and BERZON join, dissenting:

104
The majority writes a lengthy opinion in a vain effort to justify a crushing monetary judgment and a strict injunction against speech protected by the First Amendment. The apparent thoroughness of the opinion, addressing a variety of issues that are not in serious dispute,1 masks the fact that the majority utterly fails to apply its own definition of a threat, and affirms the verdict and injunction when the evidence in the record does not support a finding that defendants threatened plaintiffs.

105
After meticulously canvassing the case-law, the majority correctly distills the following definition of a true threat: "a statement which, in the entire context and under all the circumstances, a reasonable person would foresee would be interpreted by those to whom the statement is communicated as a serious expression of intent to inflict bodily harm upon that person." Maj. op. at 1076-77 (emphasis added).2 The emphasized language is crucial, because it is not illegal — and cannot be made so-merely to say things that would frighten or intimidate the listener. For example, when a doctor says, "You have cancer and will die within six months," it is not a threat, even though you almost certainly will be frightened. Similarly, "Get out of the way of that bus" is not a threat, even though it is said in order to scare you into changing your behavior. By contrast, "If you don't stop performing abortions, I'll kill you" is a true threat and surely illegal.

106
The difference between a true threat and protected expression is this: A true threat warns of violence or other harm that the speaker controls. Thus, when a doctor tells a patient, "Stop smoking or you'll die of lung cancer," that is not a threat because the doctor obviously can't cause the harm to come about. Similarly, "If you walk in that neighborhood late at night, you're going to get mugged" is not a threat, unless it is clear that the speaker himself (or one of his associates) will be doing the mugging.

107
In this case, none of the statements on which liability was premised were overtly threatening. On the contrary, the two posters and the web page, by their explicit terms, foreswore the use of violence and advocated lawful means of persuading plaintiffs to stop performing abortions or punishing them for continuing to do so. Nevertheless, because context matters, the statements could reasonably be interpreted as an effort to intimidate plaintiffs into ceasing their abortion-related activities. If that were enough to strip the speech of First Amendment protection, there would be nothing left to decide. But the Supreme Court has told us that "[s]peech does not lose its protected character ... simply because it may embarrass others or coerce them into action." NAACP v. Claiborne Hardware Co., 458 U.S. 886, 910, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (emphasis added). In other words, some forms of intimidation enjoy constitutional protection.

108
Only a year after Claiborne Hardware, we incorporated this principle into our circuit's true threat jurisprudence. Striking down as overbroad a Montana statute that made it a crime to communicate to another "a threat to ... commit a criminal offense," we stated: "The mere fact that communication induces or `coerces' action in others does not remove it from first amendment protection." Wurtz v. Risley, 719 F.2d 1438, 1441 (9th Cir.1983) (quoting Claiborne Hardware, 458 U.S. at 911, 102 S.Ct. 3409). We noted — referring to Claiborne Hardware again — that the statute criminalized pure speech designed to alter someone else's conduct, so that a "civil rights activist who states to a restaurant owner, `if you don't desegregate this restaurant I am going to organize a boycott' could be punished for the mere statement, even if no action followed." Id. at 1442. Claiborne Hardware and Wurtz hold that statements that are intimidating, even coercive, are protected by the First Amendment, so long as the speaker does not threaten that he, or someone acting in concert with him, will resort to violence if the warning is not heeded.

109
The majority recognizes that this is the standard it must apply, yet when it undertakes the critical task of canvassing the record for evidence that defendants made a true threat — a task the majority acknowledges we must perform de novo, Maj. op at 1070 — its opinion fails to come up with any proof that defendants communicated an intent to inflict bodily harm upon plaintiffs.

110
Buried deep within the long opinion is a single paragraph that cites evidence supporting the finding that the two wanted posters prepared by defendants constituted a true threat. Maj. op at 1079-80; see also id. at 1085-86 (same analysis). The majority does not point to any statement by defendants that they intended to inflict bodily harm on plaintiffs, nor is there any evidence that defendants took any steps whatsoever to plan or carry out physical violence against anyone. Rather, the majority relies on the fact that "the poster format itself had acquired currency as a death threat for abortion providers. Gunn was killed after his poster was released; Britton was killed after his poster was released; and Patterson was killed after his poster was released." Id. at 1079; see also id. at 1085-86. But neither Dr. Gunn nor Dr. Patterson was killed by anyone connected with the posters bearing their names. Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists, 41 F.Supp.2d 1130, 1134-35 (D.Or.1999). In fact, Dr. Patterson's murder may have been unrelated to abortion: He was killed in what may have been a robbery attempt five months after his poster was issued; the crime is unsolved and plaintiffs' counsel conceded that no evidence ties his murderer to any anti-abortion group. R.T. at 131, 1197.

111
The record reveals one instance where an individual — Paul Hill, who is not a defendant in this case — participated in the preparation of the poster depicting a physician, Dr. Britton, and then murdered him some seven months later. All others who helped to make that poster, as well as those who prepared the other posters, did not resort to violence. And for years, hundreds of other posters circulated, condemning particular doctors with no violence ensuing. See R.T. at 1775-76, 1783-84, 2487, 2828. There is therefore no pattern showing that people who prepare wanted-type posters then engage in physical violence. To the extent the posters indicate a pattern, it is that almost all people engaged in poster-making were non-violent.3

112
The majority tries to fill this gaping hole in the record by noting that defendants "kn[ew] the fear generated among those in the reproductive health services community who were singled out for identification on a `wanted'-type poster." Maj. op at 1079. But a statement does not become a true threat because it instills fear in the listener; as noted above, many statements generate fear in the listener, yet are not true threats and therefore may not be punished or enjoined consistent with the First Amendment. See pp. 1089-90 supra. In order for the statement to be a threat, it must send the message that the speakers themselves — or individuals acting in concert with them — will engage in physical violence. The majority's own definition of true threat makes this clear. Yet the opinion points to no evidence that defendants who prepared the posters would have been understood by a reasonable listener as saying that they will cause the harm.

113
Plaintiffs themselves explained that the fear they felt came, not from defendants, but from being singled out for attention by abortion protesters across the country. For example, plaintiff Dr. Elizabeth Newhall testified, "I feel like my risk comes from being identified as a target. And ... all the John Salvis in the world know who I am, and that's my concern."4 Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists, No. CV-95-01671-JO, at 302 (D.Or. Jan. 8, 1999); see also id. at 290 ("[U]p until January of '95, I felt relatively diluted by the — you know, in the pool of providers of abortion services. I didn't feel particularly visible to the people who were — you know, to the John Salvis of the world, you know. I sort of felt one of a big, big group."). Likewise, Dr. Warren Martin Hern, another plaintiff, testified that when he heard he was on the list, "I was terrified. [I]t's hard to describe the feeling that — that you are on a list of people to — who have been brought to public attention in this way. I felt that this was a — a list of doctors to be killed." Planned Parenthood, No. CV-95-01671 JO, at 625 (Jan. 11, 1999).

114
From the point of view of the victims, it makes little difference whether the violence against them will come from the makers of the posters or from unrelated third parties; bullets kill their victims regardless of who pulls the trigger. But it makes a difference for the purpose of the First Amendment. Speech — especially political speech, as this clearly was — may not be punished or enjoined unless it falls into one of the narrow categories of unprotected speech recognized by the Supreme Court: true threat, Watts v. United States, 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), incitement, Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), conspiracy to commit criminal acts, Scales v. United States, 367 U.S. 203, 229, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961), fighting words, Chaplinsky v. New Hampshire, 315 U.S. 568, 572-73, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), etc.

115
Even assuming that one could somehow distill a true threat from the posters themselves, the majority opinion is still fatally defective because it contradicts the central holding of Claiborne Hardware: Where the speaker is engaged in public political speech, the public statements themselves cannot be the sole proof that they were true threats, unless the speech directly threatens actual injury to identifiable individuals. Absent such an unmistakable, specific threat, there must be evidence aside from the political statements themselves showing that the public speaker would himself or in conspiracy with others inflict unlawful harm. 458 U.S. at 932-34, 102 S.Ct. 3409. The majority cites not a scintilla of evidence — other than the posters themselves — that plaintiffs or someone associated with them would carry out the threatened harm.

116
Given this lack of evidence, the posters can be viewed, at most, as a call to arms for other abortion protesters to harm plaintiffs. However, the Supreme Court made it clear that under Brandenburg, encouragement or even advocacy of violence is protected by the First Amendment: "[M]ere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment." Claiborne Hardware, 458 U.S. at 927, 102 S.Ct. 3409 (citing Brandenburg, 395 U.S. at 447) (emphasis in the original).5 Claiborne Hardware in fact goes much farther; it cautions that where liability is premised on "politically motivated" activities, we must "examine critically the basis on which liability was imposed." Id. at 915, 102 S.Ct. 3409. As the Court explained, "Since respondents would impose liability on the basis of a public address — which predominantly contained highly charged political rhetoric lying at the core of the First Amendment — we approach this suggested basis for liability with extreme care." Id. at 926-27, 102 S.Ct. 3409. This is precisely what the majority does not do; were it to do so, it would have no choice but to reverse.

117
The activities for which the district court held defendants liable were unquestionably of a political nature. There is no allegation that any of the posters in this case disclosed private information improperly obtained. We must therefore assume that the information in the posters was obtained from public sources. All defendants did was reproduce this public information in a format designed to convey a political viewpoint and to achieve political goals. The "Deadly Dozen" posters and the "Nuremberg Files" dossiers were unveiled at political rallies staged for the purpose of protesting Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Similarly, defendants presented the poster of Dr. Crist at a rally held on the steps of the St. Louis federal courthouse, where the Dred Scott decision was handed down, in order to draw a parallel between "blacks being declared property and unborn children being denied their right to live." Planned Parenthood, CV-95-01671-JO, at 2677 (Jan. 22, 1999). The Nuremberg Files website is clearly an expression of a political point of view. The posters and the website are designed both to rally political support for the views espoused by defendants, and to intimidate plaintiffs and others like them into desisting abortion-related activities. This political agenda may not be to the liking of many people — political dissidents are often unpopular — but the speech, including the intimidating message, does not constitute a direct threat because there is no evidence other than the speech itself that the speakers intend to resort to physical violence if their threat is not heeded.

118
In determining whether the record here supports a finding of true threats, not only the reasoning but also the facts of Claiborne Hardware are highly relevant. Claiborne Hardware arose out of a seven-year effort (1966 to 1972) to obtain racial justice in Claiborne County, Mississippi. Claiborne Hardware, 458 U.S. at 898, 102 S.Ct. 3409. The campaign employed a variety of tactics, one among them being the boycotting of white merchants. Id. at 900, 102 S.Ct. 3409. The boycott and other concerted activities were organized by the NAACP, in the person of its Mississippi field secretary Charles Evers, as well as by other black organizations and leaders. Id. at 898-900, 102 S.Ct. 3409.

119
In order to persuade or coerce recalcitrant blacks to join the boycott, the organizers resorted to a variety of enforcement mechanisms. These included the posting of store watchers outside the boycotted stores. These watchers, also known as "Black Hats" or "Deacons," would "identif[y] those who traded with the merchants." Id. at 903, 102 S.Ct. 3409.6 The names were collected and "read aloud at meetings at the First Baptist Church and published in a local black newspaper." Id. at 909, 102 S.Ct. 3409. Evers made several speeches containing threats — including those of physical violence — against the boycott violators. Id. at 900 n. 28, 902, 926-27, 102 S.Ct. 3409. In addition, a number of violent acts — including shots fired at individuals' homes — were committed against the boycott breakers. Id. at 904-06, 102 S.Ct. 3409.

120
The lawsuit that culminated in the Claiborne Hardware opinion was brought against scores of individuals and several organizations, including the NAACP. The state trial court found defendants liable in damages and entered "a broad permanent injunction," which prohibited the defendants from engaging in virtually all activities associated with the boycott, including picketing and using store watchers. Id. at 893, 102 S.Ct. 3409. The Mississippi Supreme Court affirmed, finding liability based on a variety of state law theories, some of which had as their gravamen the use of force or threat of force by those engaged in the boycott. Id. at 894-95, 102 S.Ct. 3409.

121
The United States Supreme Court began its opinion in Claiborne Hardware by noting that "[t]he term `concerted action' encompasses unlawful conspiracies and constitutionally protected assemblies" and that "certain joint activities have a `chameleon-like' character." Id. at 888, 102 S.Ct. 3409. The Claiborne County boycott, the Court noted, "had such a character; it included elements of criminality and elements of majesty." Id. The Court concluded that the state courts had erred in ascribing to all boycott organizers illegal acts — including violence and threats of violence — of some of the activists. The fact that certain activists engaged in such unlawful conduct, the Court held, could not be attributed to the other boycott organizers, unless it could be shown that the latter had personally committed or authorized the unlawful acts. Id. at 932-34, 102 S.Ct. 3409.

122
In the portion of Claiborne Hardware that is most relevant to our case, id. at 927-32, 102 S.Ct. 3409, the Court dealt with the liability of the NAACP as a result of certain speeches made by Charles Evers. In these speeches, Evers seemed to threaten physical violence against blacks who refused to abide by the boycott, saying that:

123
• the boycott organizers knew the identity of those members of the black community who violated the boycott, id. at 900 n. 28, 102 S.Ct. 3409;

124
• discipline would be taken against the violators, id. at 902, 927, 102 S.Ct. 3409;

125
• "[i]f we catch any of you going in any of them racist stores, we're gonna break your damn neck," id. at 902, 102 S.Ct. 3409;

126
• "the Sheriff could not sleep with boycott violators at night" in order to protect them, id.;

127
• "blacks who traded with white merchants would be answerable to him," id. at 900 n. 28, 102 S.Ct. 3409 (emphasis in the original).

128
These statements, the Supreme Court recognized, "might have been understood as inviting an unlawful form of discipline or, at least, as intending to create a fear of violence whether or not improper discipline was specifically intended." Id. at 927, 102 S.Ct. 3409 (emphasis added). Noting that such statements might not be constitutionally protected, the Court proceeded to consider various exceptions to the rule that speech may not be prohibited or punished.

129
The Court concluded that the statements in question were not "fighting words" under the rule of Chaplinsky v. New Hampshire, 315 U.S. 568, 572-73, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); nor were they likely to cause an immediate panic, under the rule of Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919) ("The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic."). Id. at 927, 102 S.Ct. 3409. Nor was the speech in question an incitement under Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), because it resulted in no immediate harm to anyone. Id. at 927-28, 102 S.Ct. 3409. The Court also cited, and found inapplicable, its one case that had held "true threats" were not constitutionally protected, Watts v. United States, 394 U.S. 705, 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). Id. at 928 n. 71, 102 S.Ct. 3409. The mere fact that the statements could be understood "as intending to create a fear of violence," id. at 927, 102 S.Ct. 3409, was insufficient to make them "true threats" under Watts.

130
The Court then considered the theory that the speeches themselves — which suggested violence against boycott violators — might constitute authorization or encouragement of unlawful activity, but flatly rejected it. Id. at 929, 102 S.Ct. 3409. The Court noted that the statements were part of the "emotionally charged rhetoric of Charles Evers' speeches," and therefore could not be viewed as authorizing lawless action, even if they literally did so: "Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech." Id. at 928, 102 S.Ct. 3409. Absent "evidence — apart from the speeches themselves — that Evers authorized ... violence" against the boycott breakers, neither he nor the NAACP could be held liable for, or enjoined from, speaking. Id. at 929, 102 S.Ct. 3409. In other words, even when public speech sounds menacing, even when it expressly calls for violence, it cannot form the basis of liability unless it amounts to incitement or directly threatens actual injury to particular individuals.

131
While set in a different time and place, and involving a very different political cause, Claiborne Hardware bears remarkable similarities to our case:

132
• Like Claiborne Hardware, this case involves a concerted effort by a variety of groups and individuals in pursuit of a common political cause. Some of the activities were lawful, others were not. In both cases, there was evidence that the various players communicated with each other and, at times, engaged in concerted action. The Supreme Court, however, held that mere association with groups or individuals who pursue unlawful conduct is an insufficient basis for the imposition of liability, unless it is shown that the defendants actually participated in or authorized the illegal conduct.

133
• Both here and in Claiborne Hardware, there were instances of actual violence that followed heated rhetoric. The Court made clear, however, that unless the violence follows promptly after the speeches, thus meeting the stringent Brandenburg standard for incitement, no liability could be imposed on account of the speech.

134
• The statements on which liability was premised in both cases were made during the course of political rallies and had a coercive effect on the intended targets. Yet the Supreme Court held in Claiborne Hardware that coercion alone could not serve as the basis for liability, because it had not been shown-by evidence aside from the political speeches themselves-that defendants or their agents were involved in or authorized actual violence.

135
• In Claiborne Hardware, the boycott organizers gathered facts — the identity of those who violated the boycott — and publicized them to the community by way of speeches and a newspaper. As in our case, this ostentatious gathering of information, and publication thereof, were intended to put pressure on those whose names were publicized, and perhaps put them in fear that they will become objects of violence by members of the community. Yet the Supreme Court held that this could not form the basis for liability.

136
To the extent Claiborne Hardware differs from our case, the difference makes ours a far weaker case for the imposition of liability. To begin with, Charles Evers's speeches in Claiborne Hardware explicitly threatened physical violence. Referring to the boycott violators, Evers repeatedly went so far as to say that "we," presumably including himself, would "break your damn neck." 458 U.S. at 902, 102 S.Ct. 3409. In our case, the defendants never called for violence at all, and certainly said nothing suggesting that they personally would be involved in any violence against the plaintiffs.

137
Another difference between the two cases is that the record in Claiborne Hardware showed a concerted action between the boycott organizers, all of whom operated within close physical proximity in a small Mississippi county. By contrast, there is virtually no evidence that defendants had engaged in any concerted action with any of the other individuals who prepared "wanted" posters in the past.7

138
The most striking difference between the two cases is that one of Evers's speeches in Claiborne Hardware, which expressly threatened violence against the boycott violators, was in fact followed by violence; he then made additional speeches, again referring to violence against boycott breakers. 458 U.S. at 900, 102 S.Ct. 3409 (April 1966 speech), at 902, 102 S.Ct. 3409 (April 1969 speeches).8 By contrast, the record here contains no evidence that violence was committed against any doctor after his name appeared on defendants' posters or web page.9

139
The opinion's effort to distinguish Claiborne Hardware does not bear scrutiny. The majority claims that in Claiborne Hardware, "there was no context to give the speeches (including the expression `break your neck') the implication of ... directly threatening unlawful conduct." Maj. op. at 1073. As explained above, the majority is quite wrong on this point, see pp. 1063 supra, but it doesn't matter anyway: Evers's statements were threatening on their face. Not only did he speak of breaking necks and inflicting "discipline," he used the first person plural "we" to indicate that he himself and those associated with him would be doing the neckbreaking, 458 U.S. at 902, 102 S.Ct. 3409, and he said that "blacks who traded with white merchants would be answerable to him," id. at 900 n. 28, 102 S.Ct. 3409 (emphasis in the original).

140
It is possible — as the majority suggests — that Evers's statements were "hyperbolic vernacular," Maj. op. at 1073,10 but the trier of fact in that case found otherwise. The Supreme Court nevertheless held that the statements ought to be treated as hyperbole because of their political content. By any measure, the statements in our case are far less threatening on their face, yet the majority chooses to defer to the jury's determination that they were true threats.

141
The majority also relies on the fact that the posters here "were publicly distributed, but personally targeted." Maj. op. at 1085. But the threats in Claiborne Hardware were also individually targeted. Store watchers carefully noted the names of blacks who entered the boycotted stores, and those names were published in a newspaper and read out loud at the First Baptist Church, where Evers delivered his speeches. 458 U.S. at 903-04, 102 S.Ct. 3409. When speaking of broken necks and other discipline, Evers was quite obviously referring to those individuals who had been identified as defying the boycott; in fact, he stated explicitly that he knew their identity and that they would be answerable to him. Id. at 900 n. 28, 102 S.Ct. 3409. The majority's opinion simply cannot be squared with Claiborne Hardware.

142
Claiborne Hardware ultimately stands for the proposition that those who would punish or deter protected speech must make a very substantial showing that the speech stands outside the umbrella of the First Amendment. This message was reinforced recently by the Supreme Court in Ashcroft v. Free Speech Coalition, 535 U.S. ___, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002), where the government sought to prohibit simulated child pornography without satisfying the stringent requirements of Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The Court rejected this effort, even though the government had earnestly argued that suppression of the speech would advance vital legitimate governmental interests, such as avoiding the exploitation of real children and punishing producers of real child pornography. See id. at 1402-04; see also id. at 1406-07 (Thomas, J., concurring in the judgment); id. at 1407-09 (O'Connor, J., concurring in the judgment in part and dissenting in part); id. at 1411-12 (Rehnquist, C.J., dissenting). The Court held that the connection between the protected speech and the harms in question is simply too "contingent and indirect" to warrant suppression. Id. at 1401-02; see also id. at 1403-04 ("The Government has shown no more than a remote connection between speech that might encourage thoughts or impulses and any resulting child abuse."). As Judge Berzon notes in her inspired dissent, defendants' speech, on its face, is political speech on an issue that is at the cutting edge of moral and political debate in our society, see Berzon Dissent at 1101-02, and political speech lies far closer to the core of the First Amendment than does simulated child pornography. "The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." Free Speech Coalition, 122 S.Ct. at 1403-04. If political speech is to be deterred or punished, the rationale of Free Speech Coalition requires a far more robust and direct connection to unlawful conduct than these plaintiffs have offered or the majority has managed to demonstrate. The evidence that, despite their explicitly non-threatening language, the Deadly Dozen poster and the Nuremberg Files website were true threats is too "contingent and indirect" to satisfy the standard of Free Speech Coalition.

143
The cases on which the majority relies do not support its conclusion. United States v. Hart, 212 F.3d 1067 (8th Cir. 2000), is a case where the communication did not merely threaten harm in the future, but was itself perceived as dangerous. The defendant there parked two Ryder trucks in the driveway of an abortion clinic, as close to the building as possible. Hart, 212 F.3d at 1069, 1072. Given the association of Ryder trucks with the Oklahoma City bombing, and the timing and location of the incident, the trucks could reasonably be suspected of containing explosives. They were much like mailing a parcel containing a ticking clock or an envelope leaking white powder. The threat in Hart came not from the message itself, but from the potentially dangerous medium used to deliver it.

144
To make Hart even remotely analogous to our case, the defendant there would have had to be picketing abortion clinics with a placard depicting a Ryder truck. We know that the Eighth Circuit would not have permitted the imposition of liability in that situation because of the careful manner in which it circumscribed its holding. The court noted that the trucks were parked in a driveway of the abortion clinic, near the entrance, rather than on the street, and that the incident was timed to coincide with a visit by the President to the area, which heightened security concerns. Id. at 1072. In light of these facts, a reasonable person could believe that the trucks might be filled with explosives, which would not have been the case, had defendant merely carried a placard with a picture of a Ryder truck. In our case, the defendants merely displayed posters at locations nowhere near the plaintiffs' homes or workplaces. The threat, if any there was, came not from the posters themselves, but from the effect they would have in rousing others to take up arms against the plaintiffs. Hart has no relevance whatsoever to our case.

145
Nor does United States v. Dinwiddie, 76 F.3d 913 (8th Cir.1996), a case involving repeated face-to-face confrontations between the defendant and the targets of her harangues, help the majority. Dinwiddie, a pro-life activist, stood outside Dr. Crist's abortion clinic and shouted various threats through a bullhorn, making it clear that she herself intended to carry them out. As Dinwiddie told one of Dr. Crist's co-workers: "[Y]ou have not seen violence yet until you see what we do to you." Id. at 925 (emphasis added). Where the speaker directly confronts her target and expressly states that she is among those who will carry out the violence, it is hardly surprising when the court finds that there has been a true threat.11

146
We have recognized that statements communicated directly to the target are much more likely to be true threats than those, as here, communicated as part of a public protest. Our caselaw also instructs that, in deciding whether the coercive speech is protected, it makes a big difference whether it is contained in a private communication-a face-to-face confrontation, a telephone call, a dead fish wrapped in newspaper12 — or is made during the course of public discourse. The reason for this distinction is obvious: Private speech is aimed only at its target. Public speech, by contrast, seeks to move public opinion and to encourage those of like mind. Coercive speech that is part of public discourse enjoys far greater protection than identical speech made in a purely private context. We stated this clearly in McCalden v. Cal. Library Ass'n, 955 F.2d 1214 (9th Cir.1990), where, relying on Brandenburg, Claiborne Hardware and Wurtz, we allowed "public speeches advocating violence" substantially more leeway under the First Amendment than "privately communicated threats." McCalden, 955 F.2d at 1222.13

147
We reaffirmed the importance of the public-private distinction in Melugin v. Hames, 38 F.3d 1478 (9th Cir.1994). Finding a death threat communicated to a magistrate judge by mail to be a "true threat," we expressly distinguished between "[t]he `threat' in Watts against President Johnson [which] was made during a public political rally opposing the Vietnam War" and defendant's threats, which "were directed in a private communication to a state judicial officer with the intent to obtain an immediate jury trial." Id. at 1484 (footnote omitted) (emphasis added).

148
In Bauer v. Sampson, 261 F.3d 775 (9th Cir.2001), two members of today's majority emphasized the importance of the public character of speech in deciding whether it constitutes a "true threat." Bauer involved a college professor who published an underground campus newsletter containing threatening criticism of the college's board of trustees.14 Noting that "[e]xpression involving a matter of public concern enjoys robust First Amendment protection," the opinion states that "although [the] writings have some violent content," the fact that they were made "in an underground campus newspaper in the broader context of especially contentious campus politics" rendered them a "hyperbole" and not a "true threat." Id. at 783-84.15 The majority seems perfectly willing to have this court treat expressly violent statements by Charles Evers and Roy Bauer as hyperbole, but to hold the entirely non-violent statements by defendants to be true threats.

149
Finally, a word about the remedy. The majority affirms a crushing liability verdict, including the award of punitive damages, in addition to the injunction.16 An injunction against political speech is bad enough, but the liability verdict will have a far more chilling effect. Defendants will be destroyed financially by a huge debt that is almost certainly not dischargeable in bankruptcy; it will haunt them for the rest of their lives and prevent them from ever again becoming financially self-sufficient. The Supreme Court long ago recognized that the fear of financial ruin can have a seriously chilling effect on all manner of speech, and will surely cause other speakers to hesitate, lest they find themselves at the mercy of a local jury. See N.Y. Times Co. v. Sullivan, 376 U.S. 254, 277-79, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The lesson of what a local jury has done to defendants here will not be lost on others who would engage in heated political rhetoric in a wide variety of causes.

150
In that regard, a retrospective liability verdict is far more damaging than an injunction; the latter at least gives notice of what is prohibited and what is not. The fear of liability for damages, and especially punitive damages, puts the speaker at risk as to what a jury might later decide is a true threat, and how vindictive it might feel towards the speaker and his cause. In this case, defendants said nothing remotely threatening, yet they find themselves crucified financially. Who knows what other neutral statements a jury might imbue with a menacing meaning based on the activities of unrelated parties. In such circumstances, it is especially important for an appellate court to perform its constitutional function of reviewing the record to ensure that the speech in question clearly falls into one of the narrow categories that is unprotected by the First Amendment. The majority fails to do this.

151
While today it is abortion protesters who are singled out for punitive treatment, the precedent set by this court — the broad and uncritical deference to the judgment of a jury — will haunt dissidents of all political stripes for many years to come. Because this is contrary to the principles of the First Amendment as explicated by the Supreme Court in Claiborne Hardware and its long-standing jurisprudence stemming from Brandenburg v. Ohio, I respectfully dissent.

Notes:

1
For example, it is clear that context may be taken into account in determining whether something is a true threat, an issue to which the majority devotes 16 pagesSee Maj. op. at 1070-75. Nor is there a dispute that someone may be punished for uttering threats, even though he has no intent to carry them out, see id. at 1076-77, or that we defer to the factfinder on questions of historical fact in First Amendment cases, id. at 1067-68.

2
Although the majority's definition does not specify who is to inflict the threatened harm, use of the active verb "inflict" rather than a passive phrase, such as "will be harmed," strongly suggests that the speaker must indicate he will take an active role in the inflicting. Recent academic commentary supports the view that this requirement is an integral component of a "true threat" analysisSee Steven G. Gey, The Nuremberg Files and the First Amendment Value of Threats, 78 Tex. L.Rev. 541, 590 (2000) (part of what "separates constitutionally unprotected true threats from constitutionally protected Claiborne Hardware-style political intimidation is [that] the speaker communicates the intent to carry out the threat personally or to cause it to be carried out"); Jennifer E. Rothman, Freedom of Speech and True Threats, 25 Harv. J.L. & Pub. Pol'y 283, 289 (2001) ("determining what is a true threat [should] require[] proof that the speaker explicitly or implicitly suggest that he or his co-conspirators will be the ones to carry out the threat").

3
The majority so much as admits that the Nuremberg Files website does not constitute a threat because of the large number of people listed there. Maj. op. at 1080. The majority does point out that doctors were listed separately, and that the names of doctors who were killed or wounded were stricken or greyed out,id. at 1080, but does not explain how this supports the inference that the posting of the website in any way indicated that defendants intended to inflict bodily harm on plaintiffs. At most, the greying out and strikeouts could be seen as public approval of those actions, and approval of past violence by others cannot be made illegal consistent with the First Amendment. See Hess v. Indiana, 414 U.S. 105, 108-09, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973); Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); Edwards v. South Carolina, 372 U.S. 229, 237-38, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Noto v. United States, 367 U.S. 290, 297-99, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961).

4
In December 1994, John Salvi killed two clinic workers and wounded five others in attacks on two clinics in Brookline, Massachusetts; Salvi later fired shots at a clinic in Norfolk, Virginia before he was apprehendedSee Planned Parenthood, 41 F.Supp.2d at 1135-36. Salvi is not a defendant in this case and, as far as the record reveals, was not engaged in the preparation of any posters.

5
UnderBrandenburg, advocacy can be made illegal if it amounts to incitement. But incitement requires an immediacy of action that simply does not exist here, which is doubtless why plaintiffs did not premise their claims on an incitement theory.

6
It would appear that in the small Mississippi community in Claiborne County, black residents knew each other on sight

7
The closest connection the district court could find between defendants and any of these individuals was a visit paid by two defendants, Andrew Burnett and Catherine Ramey, to John Burt, a maker of such posters. At that meeting, they "discussed `wanted' posters."Planned Parenthood, 41 F.Supp.2d at 1135. The district court did not find that defendants participated in the preparation of Burt's posters, nor that they otherwise engaged in concerted activities with other abortion protesters.

8
On April 1, 1966, Evers made a speech "directed to all 8,000 plus black residents of Claiborne County," where he said that "blacks who traded with white merchants would beanswerable to him" and that "any `uncle toms' who broke the boycott would `have their necks broken' by their own people." Claiborne Hardware, 458 U.S. at 900 n. 28, 102 S.Ct. 3409 (emphasis in the original). Later that year, violence was, indeed, committed against blacks who refused to join the boycott. Id. at 928, 102 S.Ct. 3409. In April 1969, Evers reiterated his message in two other speeches, saying that "boycott violators would be `disciplined' by their own people" and that "`If we catch any of you going in any of them racist stores, we're gonna break your damn neck.'" Id. at 902, 102 S.Ct. 3409.

9
The majority mentions that "[o]ne of the ... doctors on the Deadly Dozen poster had in fact been shot before the poster was published." Maj. op. at 1073. The physician in question, Dr. Tiller, was shot and wounded in August 1993, a year and a half before the Deadly Dozen poster was unveiledPlanned Parenthood, 41 F.Supp.2d at 1131-32, 1135. The majority does not explain how including Dr. Tiller's name on the Deadly Dozen poster contributed to the poster's threatening message. To the extent it is relevant at all, inclusion of Dr. Tiller's name cuts the other way because it goes counter to the supposed pattern that the majority is at such pains to establish, namely that listing of a name on a poster was followed by violence against that person. As to Dr. Tiller, that order is obviously reversed.

10
In support of this claim, the majority states that there was no "indication that Evers's listeners took his statement that boycott breakers' `necks would be broken' as a serious threat thattheir necks would be broken; they kept on shopping at boycotted stores." Maj. op. at 1073. The majority extrapolates this conclusion from only four out of ten incidents of boycott-related violence cited in Claiborne Hardware. See 458 U.S. at 904-06, 102 S.Ct. 3409. Although these were the four incidents about which the most information was available — perhaps because these four particular victims were not afraid to lodge a complaint or to come forward and testify — they alone are hardly sufficient to support a conclusion that Evers's audience largely ignored his warnings.

11
Even then,Dinwiddie is instructive for the restraint it exercised in granting relief. Dinwiddie was not subjected to a crushing and punitive award of damages, and the injunction against her was narrowly drawn and carefully tailored to accommodate her legitimate interests, including her interest in free expression. She was not banned from all speech of a certain kind, but only from speech that expressly violates the Freedom of Access to Clinic Entrances Act or is delivered through a bullhorn within 500 feet of an abortion clinic. Dinwiddie, 76 F.3d at 928-29. The Eighth Circuit emphasized that "[t]he types of activity that the injunction would proscribe are quite narrow," and that Dinwiddie would be free to "carry signs, distribute literature, and speak at a reasonable volume even when she is within 500 feet of an abortion clinic." Id. By contrast, the injunction in our case indefinitely bars defendants from publishing, reproducing, distributing (and even owning) the posters, the website or anything similar, anywhere in the United States. Planned Parenthood, 41 F.Supp.2d at 1155-56.

12
See The Godfather (Paramount Pictures 1972).

13
In my dissent from the failure to takeMcCalden en banc, I argued that this distinction was inapposite in McCalden because the statement involved — a warning by Holocaust survivors that they will disrupt an exhibit by a Holocaust revisionist with a demonstration — could not be characterized as a threat, even if communicated in private. McCalden, 955 F.2d at 1229 (Kozinski, J., dissenting from denial of rehearing en banc). I did not, of course, disagree with McCalden's holding that public statements are entitled to more protection than private ones.

14
These writings included a reference to a "two-ton slate of polished granite" that defendant "hope[d to] drop" on the college president; a comment that "no decent person could resist the urge to go postal" at a meeting of the board; a fantasy description of a funeral for one of the trustees; and creating "a satisfying acronym: MAIM" from the college president's nameBauer, 261 F.3d at 780.

15
In fact,no prior case in our circuit has ever found statements charged with political content and delivered in a public arena to be true threats. See, in addition to the cases already cited, Lovell v. Poway Unified Sch. Dist., 90 F.3d 367 (9th Cir.1996) (finding a "true threat" where a student directly threatened to kill the school counselor in her own office); United States v. Gordon, 974 F.2d 1110 (9th Cir.1992) (imposing liability where defendant entered former President Reagan's house and, when apprehended, repeatedly asserted his wish to kill the President); United States v. Orozco-Santillan, 903 F.2d 1262 (9th Cir.1990) (holding that defendant's statements to an INS agent, delivered face-to-face and by phone, that the agent "will pay" for defendant's arrest, were "true threats"); United States v. Gilbert, 884 F.2d 454 (9th Cir.1989) (finding a true "threat" where a white supremacist mailed a threatening letter and several posters directly to the founder of an adoption agency that placed minority children with white families); United States v. Mitchell, 812 F.2d 1250 (9th Cir.1987) (finding a "true threat" where defendant, when questioned by customs officials and Secret Service agents in isolation, repeatedly threatened to kill President Reagan); United States v. Merrill, 746 F.2d 458, 460 (9th Cir.1984) (finding a "true threat" where defendant mailed to several individuals "letters [with] macabre and bloody depictions of President Reagan along with the words `Kill Reagan'"); Roy v. United States, 416 F.2d 874, 876 & n. 6 (9th Cir. 1969) (finding that a statement by a marine to the telephone operator that he is "going to get" arriving President Johnson constitutes a threat, but suggesting that its decision could have been different if the "words were stated in a political ... context").

16
Although the majority remands the award of punitive damages, such award is affirmed unless grossly disproportionateSee In re Exxon Valdez, 270 F.3d 1215, 1241 (9th Cir. 2001).

152
BERZON, Circuit Judge, with whom REINHARDT, KOZINSKI, and KLEINFELD, Circuit Judges, join, and O'SCANNLAIN, Circuit Judge, joins as to Part III only, dissenting:

153
This case is proof positive that hard cases make bad law, and that when the case is very hard — meaning that competing legal and moral imperatives pull with impressive strength in opposite directions — there is the distinct danger of making very bad law.

154
The majority opinion in this case suitably struggles with the difficult First Amendment issues before us concerning whether the posters and website at issue are or are not First Amendment protected speech. The legal standard the majority applies, however, is, in my view, insufficiently cognizant of underlying First Amendment values, for reasons that are largely explained in Judge Kozinski's dissent, and for additional reasons that I develop below.

155
Moreover, the majority, in an offhand way, also decides two evidentiary issues that, I can say with some confidence, would not be decided so summarily, and would probably not be decided in the same way, were this a less wrenching case on its facts. Keeping one's eyes on the broader picture is not always easy when people's lives — in this case the lives of medical professionals — are being severely disrupted because they are performing constitutionally protected activities in a perfectly lawful manner at the behest of people who want their services and are entitled to have them. As judges, though, we need to recognize that we are not writing for this day and place only, and that rulings that appear peripheral in the present context will take on great significance as applied in another.

156
* The First Amendment and True Threats

157
1. Clarifying the issue: The reason this is a hard First Amendment case becomes somewhat obscured in all the factual detail and quotation of precedent that we as judges engage in. The essential problem — one that, as far as I am aware, is unique in the plethora of "threat" cases and perhaps more generally in First Amendment jurisprudence — is that the speech for which the defendants are being held liable in damages and are enjoined from reiterating in the future is, on its face, clearly, indubitably, and quintessentially the kind of communication that is fully protected by the First Amendment.

158
The point is not simply that the two posters and the Nuremberg files contain no explicit threats that take them outside the free speech umbrella. We are not talking simply about ambiguous or implicit threats that depend on context for their meaning, such as the Ryder trucks in United States v. Hart, 212 F.3d 1067 (8th Cir.2000). Rather, the pivotal issue for me is that what the communications in this case do contain has all the attributes that numerous cases and commentators have identified as core factors underlying the special protection accorded communication under our Constitution.

159
The posters and website are all public presentations on a matter of current moral and political importance; they provide information to the public on that matter and propose a — peaceful, legal — course of action; and they were presented with explicit reference to great moral and political controversies of the past. Cases that are a virtual First Amendment "greatest hits" establish that these kinds of expressions — those that provide information to the public (particularly when directed at publicly-available media), publish opinions on matters of public controversy, and urge others to action — are the kinds of speech central to our speech-protective regime, and remain so even when the message conveyed is, in substance, form, or both, anathema to some or all of the intended audience. See, e.g., Garrison v. Louisiana, 379 U.S. 64, 74-75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."); Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people."); New York Times Co. v. Sullivan, 376 U.S. 254, 266, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (The First Amendment "attempt[s] to secure the widest possible dissemination of information from diverse and antagonistic sources."); Id. at 271, 84 S.Ct. 710 ("The constitutional protection does not turn upon the truth, popularity, or social utility of the ideas and beliefs which are offered."); Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) ("Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period."); Thomas v. Collins, 323 U.S. 516, 537, 65 S.Ct. 315, 89 L.Ed. 430 (1945) ("`Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts."); Terminiello v. City of Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (Speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.").

160
Tested against these most basic premises, there can be no doubt that the documents upon which the damages judgment and injunction in this case were based were, on their face, "expression[s] of grievance and protest on one of the major public issues of our time," and, as such, documents that "would seem clearly to qualify for ... constitutional protection." New York Times, 376 U.S. at 271, 84 S.Ct. 710. The posters and website could not and would not have been proscribed, as "true threats" or otherwise, had there been no (1) history of similar — although not at all identical — publications put out by other people that were followed by murders-by other people, not members of either of the two defendant organizations — of health professionals who performed abortions; and (2) repeated advocacy by these defendants of the proposition that violence against abortion providers can be morally justified, advocacy that all concede was, standing alone, itself protected by the First Amendment. See Brandenburg v. Ohio, 395 U.S. 444, 447-48, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) ("[T]he mere abstract teaching ... of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action.") (quoting Noto v. United States, 367 U.S. 290, 297-98, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961)).1 The precise question before us is therefore whether that context is sufficient to turn a set of communications that contain speech at the core of the First Amendment's protections into speech that can be proscribed pursuant to an injunction and compensated for through damages.

161
2. An analogy: Stated in those terms, the issue bears a close resemblance to that faced by the courts with regard to First Amendment limitations on defamation actions, beginning with New York Times Co. v. Sullivan. Like "true threats," false speech has long been understood as a category of communication that contains few of the attributes that trigger constitutional speech protection and so great a likelihood of harming others that we refer to the speech as being beyond the protection of the First Amendment. See R.A.V. v. City of St. Paul, 505 U.S. 377, 383, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). Like "true threats," false, defamatory speech can severely disrupt peoples' lives, both by affecting them emotionally (as does apprehension of danger) and by impairing their social ties, their professional activities, and their ability to earn a living (as does the perceived need to protect oneself from physical harm).

162
The Supreme Court since the 1960s has developed a set of discrete principles designed not to provide false speech with constitutional protection, but to erect, on an ascending scale depending upon the perceived value of the particular kind of speech to the common dialogue that the First Amendment is designed to foster, doctrinal protections within defamation law that minimize self-censorship of truthful speech. Those protections are based upon realistic assessment of the vagaries of litigation and the fear of crippling damages liability.2

163
For example, New York Times observed that "[a]llowance of the defense of truth... does not mean that only false speech will be deterred," because "[u]nder such a rule, would be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." 376 U.S. at 279, 84 S.Ct. 710; see also Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("[T]o assure to the freedoms of speech and press that `breathing space' essential to their fruitful exercise ... this Court has extended a measure of strategic protection to defamatory falsehood.") (internal citation omitted). Without a federal constitutional requirement focusing on the speaker's state of mind with regard to the truth of what he was saying (as well as careful scrutiny by the courts of any jury verdict based purely upon speech), the Court concluded, there would be a distinct danger that fear of defamation liability would "dampen[] the vigor and limit[] the variety of public debate," to the detriment of First Amendment values. Id. The problem has been treated as one of balancing the very real injury caused by unwarranted damage to reputation against the dangers to the system of free expression worked by rules of liability that are easy to misperceive or to misapply in particular instances. And the Court's answer to this problem has, as noted, been far from unitary. Instead, the balance has been struck with regard to subcategories of defamation cases, according to the nature of the communication, the nature of the parties and, to some degree, the purpose of the speech.3

164
Our problem here is similar. Any "true threats" within the three communications at issue were encased in documents and public events that promoted — at least for those listeners not "in the know" — precisely the kind of "debate on public issues [that] should be uninhibited, robust, and wide-open, and that ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks...." New York Times, 376 U.S. at 270, 84 S.Ct. 710. True, the targeted medical professionals and clinics were not public officials, but they were engaged in activities that the defendants, rightly or wrongly, regarded as both morally reprehensible and a matter for eventual governmental proscription through the political process (presumably through a constitutional amendment). Moreover, as both the majority and Judge Kozinski recognize, the posters and website remained core First Amendment speech even though — quite aside from any coded threat of physical harm — they exposed the targeted plaintiffs to other, nonviolent but still extremely disturbing, interference with their daily lives (in the form of unwanted public exposure and inflammatory rhetoric directed at them, their families, and their customers, both at home and at work) and even if they induced fear in the plaintiffs that people unconnected with the defendants might harm them.4

165
Under these circumstances, the question for me becomes devising standards that, like the constitutional defamation standards that vary with the strength of the protection of the communication, rely not on an unitary "true threats" standard, as does the majority, but on considerations that lessen the danger of mistaken court verdicts and resulting self-censorship to a greater or lesser degree depending upon the nature of the speech in question and the role of speech of that nature in the scheme of the First Amendment.5

166
3. Some constitutional parameters: Judge Kozinski, in his dissent, makes one important suggestion toward this end with which, for all the reasons already canvassed, I fully agree: He suggests that "statements communicated directly to the target are much more likely to be true threats than those, as here, communicated as part of a public protest." Kozinski dissent at 7162. As a first cut at separating out the kinds of allegedly threatening communications that are central to First Amendment values and therefore must be tested by particularly stringent criteria before they can be prohibited, these two criteria — the public nature of the presentation and content addressing a public issue (which can include matters of social or economic as well as political import for the individuals involved, see Bartnicki v. Vopper, 532 U.S. 514, 535, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001); Thornhill, 310 U.S. at 102-03, 60 S.Ct. 736) — are critical.

167
In a rare instance, a threat uttered in the course of a public political protest might conceivably exceed the bounds of protected speech. United States v. Kelner, 534 F.2d 1020 (2d Cir.1976), is illustrative. (I am not aware of any case in this circuit in which a defendant was, as in Kelner, punished or held liable for a threat uttered in the course of public protest activity — a gap in itself telling with regard to the importance and novelty of this case.) In Kelner, a member of the Jewish Defense League stated at a press conference held in New York just before Yassir Arafat was scheduled to be in the city that "We have people who have been trained and who are out now and who intend to make sure that Arafat and his lieutenants do not leave this country alive.... We are planning to assassinate Mr. Arafat.... Everything is planned in detail.... It's going to come off." Id. at 1021. The press conference was broadcast on television that evening.6 Id. The Second Circuit upheld the defendant's conviction for uttering the threat, over the objection that the speech was simply an extreme statement of opposition to Mr. Arafat, protected under the First Amendment as hyperbolic public discussion of a public issue. Id. at 1024-28.

168
In doing so, the Second Circuit recognized that where the asserted threat "is made in the midst of what may be other protected political expression," courts must be vigilant to permit liability or conviction only in circumstances in which the danger to free expression is minimal; where that is the case, "the threat itself may affront such important social interests that it is punishable." Id. at 1027. The criteria the Second Circuit suggested to police the dividing line were that "the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." Id. Measured against these criteria, Kelner held that, although politically motivated and designed to convey a public position of protest to Mr. Arafat's policies, the speech in question was not protected speech. Id. at 1028.

169
Kelner's criteria for adjudging the protection accorded alleged threats uttered in the course of public communications on public issues seem appropriate to me — and, as I show below, consistent with NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) — with one exception, an addition, and some explication:

170
First, the exception: I would not include the imminence or immediacy of the threatened action as a prerequisite to finding a true threat delivered as part of a public speech, if all of the other factors were present. The immediacy requirement calls to mind the standard the Supreme Court erected for proscription of inciting speech in Brandenburg. But as the majority can be read to recognize and as Judge Kozinski well explains, the separate constitutional category of unprotected speech for threats does not include statements that induce fear of violence by third parties.

171
Where there is no threat, explicit or implicit, that the speaker or someone under his or her control intends to harm someone, a statement inducing fear of physical harm must be either (1) a prediction or warning of injury, or (2) an inducement or encouragement of someone else to cause the injury. The former is, as Judge Kozinski suggests, clearly entitled to protection under the First Amendment as either informative or persuasive speech. The latter kind of statement may or may not be protected. Whether it is or not must be governed by the strict inducement standard of Brandenburg if the more than fifty years of contentious development of the protection of advocacy of illegal action is not to be for naught. See Brandenburg, 395 U.S. at 447-48, 89 S.Ct. 1827 (overruling Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927), and holding that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action"); see also id. at 450-454, 89 S.Ct. 1827 (Douglas, J., concurring) (recounting the history of the "clear and present danger" doctrine for adjudging the constitutionality of restrictions upon advocacy of illegal action).

172
One can, however, justify a somewhat different standard for judging the constitutionality of a restriction upon threats than for a restriction upon inducement of violence or other illegal action. There is a difference for speech-protective purposes between a statement that one oneself intends to do something and a statement encouraging or advocating that someone else do it. The latter will result in harmful action only if someone else is persuaded by the advocacy. If there is adequate time for that person to reflect, any harm will be due to another's considered act. The speech itself, in that circumstance, does not create the injury, although it may make it more likely. The Supreme Court has essentially decided that free expression would be too greatly burdened by anticipatory squelching of advocacy which can work harm only indirectly if at all. See Kelner, 534 F.2d at 1027 n. 9 ("Short of [advocacy that is close, direct, effective and instantaneous in its impact] the community must satisfy itself with punishment of the one who committed the violation of law or attempted to do so, not punishment of the person who communicated with him about it.") (quoting Thomas Emerson, The System of Freedom of Expression 404-05 (1970)); see also Ashcroft v. Free Speech Coalition, 535 U.S. ___, 122 S.Ct. 1389, 1403, 152 L.Ed.2d 403 (2002) (because "the Court's First Amendment cases draw vital distinctions between words and deeds," the government may not punish speech because it increases the chance that someone other than the speaker will commit an unlawful act).

173
A true threat, in contrast, implies a firmness of purpose by the person speaking, not mediated through anyone else's rational or emotional reaction to the speech. Threatening speech thereby works directly the harms of apprehension and disruption, whether the apparent resolve proves bluster or not and whether the injury is threatened to be immediate or delayed. Further, the social costs of a threat can be heightened rather than dissipated if the threatened injury is promised for some fairly ascertainable time in the future — the "specific" prong — for then the apprehension and disruption directly caused by the threat will continue for a longer rather than a shorter period. So, while I would police vigorously the line between inducement and threats — as the jury instructions in this case did,7 although the majority opinion is less clear on this point — I would, where true threats are alleged, not require a finding of immediacy of the threatened harm.

174
Second, the addition: Although this court's cases on threats have not generally set any state of mind requirements, I would add to the Kelner requirements for proscribable threats in the public protest context the additional consideration whether the defendant subjectively intended the specific victims to understand the communication as an unequivocal threat that the speaker or his agents or coconspirators would physically harm them.8 Especially where the plaintiffs in such circumstances are relying only on surrounding context and are doing so to overcome the literal import of the words spoken, impairment of free public debate on public issues through self-censorship is a distinct possibility unless there is convincing proof that the literal meaning of the words was not what the defendants intended to convey.

175
The subjective intent requirement for alleged threats delivered in the course of public protest comports with Supreme Court precedent, both directly and by analogy. Although the Supreme Court has yet to outline fully the constitutional limitations applicable to proscription of threats, in its most direct look at the subject the Court expressed "grave doubts" that a person could be liable for threatening expression solely on the basis of an objective standard. Watts v. United States, 394 U.S. 705, 707-08, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). A few months later, in Brandenburg, the Court held that in an incitement case, the plaintiff or the government must not only prove that a statement "is likely to incite or produce" imminent lawless action, but must also prove that the statement "is directed to inciting or producing" such action. 395 U.S. at 447, 89 S.Ct. 1827. This latter requirement is a subjective intent prerequisite, as it turns the speaker's liability in an incitement case on how the speaker intends others to understands his words. See also Hess v. Indiana, 414 U.S. 105, 109, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (speech cannot be punished when no evidence exists that "words were intended to produce" imminent disorder).

176
With regard to this subjective intent requirement, there is no meaningful distinction between incitement cases and threat cases such as this one — that is, cases involving public protest speech, especially where the alleged threat, on its face, consisted entirely of advocacy. The First Amendment protects advocacy statements that are likely to produce imminent violent action, so long as the statements are not directed at producing such action. To do otherwise would be to endanger the First Amendment protection accorded advocacy of political change by holding speakers responsible for an impact they did not intend.

177
Similarly, a purely objective standard for judging the protection accorded such speech would chill speakers from engaging in facially protected public protest speech that some might think, in context, will be understood as a true threat although not intended as such. Unsure of whether their rough and tumble protected speech would be interpreted by a reasonable person as a threat, speakers will silence themselves rather than risk liability. Even though the Supreme Court has stated that protected political speech "is often vituperative, abusive, and inexact," speakers wishing to take advantage of these protected rhetorical means may be fearful of doing so under the majority's purely objective approach. Watts, 394 U.S. at 708, 89 S.Ct. 1399; see also Rogers v. United States, 422 U.S. 35, 47, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975) (Marshall, J., concurring).9

178
When the district court issued the injunction against the defendants, the court, for reasons it does not explain, relied on a different definition of threat than the one it instructed the jury to use. In contrast to the definition relied upon by the jury, the definition used for purposes of the injunction correctly incorporated the subjective intent requirement mandated by the First Amendment. Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists, 41 F.Supp.2d 1130, 1155 n. 1 (D.Or.1999). In addition, the district court found that the defendants did intend to threaten. As a result, the injunction comes close to conforming on its face to the dictates of the First Amendment. The injunction still falls short, however, because the district court did not state that a threat must be unequivocal, nor did it find the posters to be unequivocal threats. As I explain below, any definition of threats that does not include the unequivocal requirement provides too little protection for public political speech.10

179
Third, the explication: "Unequivocal" cannot mean literal: Ryder trucks, in the United States in the 1990s, and burning crosses, in the United States in the twentieth and twenty-first centuries, have unambiguous meanings that the individuals targeted will be hurt (at least unless they do what the perpetrator of the threat wants them to do, whether it be stop performing abortions or move out of town). Instead, "unequivocal" means to me unambiguous, given the context. As such, the requirement is essentially a heightened burden of proof, requiring that a threatening meaning be clearly and convincingly apparent. And in determining whether that proof standard has been met, I would continue to apply the objective standard the majority embraces, based on our cases, in determining whether the speech in fact communicates an intent to harm specific individuals.

180
This case, I repeat, is uniquely difficult because to perceive a threat, one must disregard the actual language used and rely on context to negate the ordinary meaning of the communication. Further, the actual language is, in its own right, core First Amendment speech, speech that to a naive reader communicates protected information and ideas. So the crux of the plaintiffs' cause of action (once one accepts that only statements that evince an intention by the speaker or his or her agents to carry out the threat can be actionable) is really an assertion that the defendants were using Aesopian language or could be understood as doing so, and that the context in which the speech must be viewed provides the necessary evidence of the defendants' true, albeit coded, meaning.11

181
The first set of contextual evidence involves the poster/~murder/poster/murder pattern the majority principally relies upon. Had the murders — or any murders, or any serious violence — been committed by the defendants and had the plaintiffs known that, the inference from the poster/murder pattern that the publication by them of posters similar to those previously followed by a murder might be a strong one.12 The inference would be stronger had the defendants also put out the earlier posters and had the plaintiffs known that. Neither is the case.

182
Plaintiffs' main submission to fill this gap was extensive evidence concerning the defendants' opinions condoning the use of violence against medical professionals who perform abortions, including general statements to that effect and particular statements concerning the people who murdered the doctors depicted on the previous posters, stating that their actions were justified and that they should be acquitted. Plaintiffs' closing argument, for example, went on for pages and pages about defendants' meetings and writings concerning the "justifiability of the use of force."

183
This evidence is certainly of some pertinence as to what the defendants may have intended to do.13 It is more likely that someone who believes in violence would intentionally threaten to commit it. It is also pertinent to what persons in the plaintiffs' position—that is, persons involved in the abortion controversy and alert to the division of opinion within it — would likely understand concerning defendants' communication. Individuals who believe in violence are not only more likely to threaten to commit it but also actually to commit it, and so defendants' views might well influence plaintiffs' perception of their speech. And since the defendants would know that, defendants' public statements approving the use of violence against doctors who perform abortion are relevant to whether reasonable speakers in defendants' position would expect their communications to be understood as threats.

184
At the same time, heavy reliance on evidence of this kind raises profound First Amendment issues of its own. One cannot read plaintiffs' closing argument in this case without fearing that the jury was being encouraged to hold the defendants liable for their abstract advocacy of violence rather than for the alleged coded threats in the posters and website, the instructions to the jury to the contrary notwithstanding. And while advocacy evidence may make both an intent to threaten and a perception that there was a threat more likely, that is not unequivocally so. People do not always practice what they preach, as the stringent incitement standard recognizes. If we are serious about protecting advocacy of positions such as defendants' sanctioning of violence, as we are constrained to be, then permitting that protected speech to be the determinative "context" for holding other facially protected, public protest speech — the posters and website in this case — to be a "true threat" seems to me simply unacceptable under the First Amendment.

185
Finally, I note that the approach I've outlined here fully comports with Claiborne Hardware. Claiborne Hardware applied an "extreme care" standard in determining "liability on the basis of a public address-which predominantly contained highly charged political rhetoric." 458 U.S. at 926-927, 102 S.Ct. 3409. It went on to note that "[i]n the passionate atmosphere in which the speeches were delivered, they might have been understood as inviting an unlawful form of discipline or, at least, as intending to create a fear of violence whether or not improper discipline was specifically intended." Id. at 927, 102 S.Ct. 3409 (emphasis added). After reviewing the actual words used in context, however, the Court concluded that "Evers' addresses did not exceed the bounds of protected speech." Id. at 929, 102 S.Ct. 3409. As I read the opinion, it held, essentially, that the supposed threats were not on their face unequivocal and were not made unequivocal by any contextual factors. So here.

186
I would therefore hold that under the special rules I would apply to public protest speech such as that in this case, plaintiffs' judgment cannot stand because, after a proper review of the record, we would have to conclude that there was no unequivocal, unconditional14 and specific threat.15

II

187
Federal Law Enforcement Officers' Testimony Regarding Threats

188
I also disagree with the majority's conclusion that permitting law enforcement officers to testify as to their opinions about the meaning and import of the posters at issue was within the district court's discretion. The government may not seek to persuade a jury that certain speech contains characteristics that place it outside the realm of constitutionally protected speech by providing in testimony, as opposed to in a criminal indictment, its "nonjudicial determination" on the ultimate legal issue to be decided. Hill v. Rolleri, 615 F.2d 886, 890 (9th Cir.1980).

189
The district court permitted the officers to repeat in testimony the warnings that the officers gave the plaintiffs after the release of the posters, purportedly in order to show the plaintiffs' state-of-mind in response to the posters. Under this rationale, the testimony had very little, if any, relevance to the issues before the jury, and, especially in light of the First Amendment concerns the testimony raises, the resulting prejudice greatly outweighed its minimal probative value. The district court, therefore, abused its discretion in failing to exclude this testimony under Fed.R.Evid. 403.16

190
1. The testimony: The district court permitted the plaintiffs to call to testify an FBI agent, with 25 years experience, and two United States Marshals, one with 26 years and the other with 14 years experience. The following testimony was given:

191
"I told her that I was in receipt of threat information in the form of a flyer."

192
"That I had received a copy of a list called the Deadly Dozen List, which listed 13 doctors, who perform abortions, and that it was threatening in nature...."

193
"I told her that I thought that her teachers, the teachers of her children, should know about this threat, as well, in order to maintain the security of the children."

194
"I told her that the children should be aware of — of the threat."

195
"I told him that he was on a threat list...."

196
"I told her that if she received additional threats or wanted protection, these were the numbers to contact...."

197
"And we discussed the reasons we believed that the threat was serious.... We discussed the escalation in the incidents over the prior couple of years. We talked about the murder of Dr. Gunn in Florida. We talked about shootings involving Dr. Tiller in Kansas. We talked about shootings involving Dr. Christ. We talked about Michael Bray and his affiliation with the American Coalition of Life Advocates."

198
"Well, because of the nature of the threats, and — I asked Dr. Hern to — he had a bulletproof vest. I thought it would be a good thing if he wore that."

199
(emphases added). The testimony not only revealed the individual law enforcement officers' opinions of the meaning of the posters, but also informed the jury about the opinion of "headquarters," as follows:

200
"I told him ... that I had been given instructions to notify — to immediately notify him, so that he could take some personal precautions for his safety."

201
"I was contacted by my headquarters in Washington, D.C. ... I advised her that the Marshal's Service was offering her protection, because her name appeared on the list, and stated that if she wanted protection, I would forward the request to our headquarters, who would then forward it to the Department of Justice."

202
"I was directed by my headquarters to immediately contact Dr. Warren Hern, because he was listed on the — the document. But, additionally, I was directed to contact all of the clinics in the district of Colorado." The officer further testified that he did contact all of the clinics in Colorado. "[H]eadquarters was taking this threat very seriousily."

203
"I explained to Dr. Hern that Michael Bray had been a conspirator in — or involved in a conspiracy to blow up several abortion clinics. And because of his affiliation, in addition to the other things we discussed, that my headquarters believed that this was [a] serious threat, and something that — that we had to act on immediately."

204
(emphases added).

205
My major concern here involves the First Amendment repercussions of allowing testimony by government employees as to the government's opinion concerning whether speech is outside the First Amendment's protections. In keeping with traditional Rule 403 analysis, however, I first explain why the testimony did not serve to elucidate any of the issues properly before the jury and then turn to the prejudicial effect the testimony had on the defendants' First Amendment rights.

206
2. Basic Rule 403 analysis: The majority holds the law enforcement testimony probative because it has "some tendency to show the physicians' state of mind when they found out they were named on `wanted' — type posters...." Majority Op. at 1082. Under the definition of a true threat that the majority uses (and under the one I would adopt, see Part I, supra) the plaintiffs' state of mind is relevant only to the extent that it tends to show "whether a reasonable person would foresee" that the plaintiffs would interpret the posters as threats. Majority Op. at 1074. The officers' testimony concerning the warnings muddled rather than illuminated the inquiry into the question how a reasonable lay person would understand the posters, as that testimony revealed the officers' reaction to the posters, not the plaintiffs'. The true threat standard focuses on how "those to whom the maker communicates the statement" would "interpret[]" it, not on the government's determination of whether a threat was made. See id. So the officers' reaction to the posters is largely irrelevant. Further, to the extent the testimony did tend to show the plaintiffs' state of mind, it suggested what the plaintiffs' reaction may have been to the officers' warnings or to the combination of learning about the posters and receiving the warnings, not simply to the posters themselves.

207
During the testimony of one of the officers, the district court instructed the jury to consider the testimony only for what it revealed about the state of mind of the recipient of the warnings and not to take the testimony as an "administrative decision" that the posters constituted true threats. To the extent that the officers' testimony did bear on any pertinent issue — which, as I indicated above, is little if at all — the court's limiting instruction did not do much to maintain the jury's focus on this issue, as the court did not repeat the instruction when each of the law enforcement officers testified, nor did the court instruct the jury on this issue before deliberations, despite the defendants' request that the court do so.

208
It is unlikely that a jury can put aside the opinions of an FBI agent and United States Marshals — and their headquarters — as to the nature of the speech and instead focus solely on how those opinions bore on the plaintiffs' state of mind. See United States v. Gutierrez, 995 F.2d 169, 172 (9th Cir.1993) ("[T]he expert testimony of a law enforcement officer ... often carries an aura of special reliability and trustworthiness.") (quoting United States v. Espinosa, 827 F.2d 604, 613 (9th Cir.1987)). On traditional evidentiary grounds alone, such testimony should not be admitted in threats cases.

209
3. First Amendment-related prejudice: Turning now to the issue I find most troubling, the First Amendment ramifications of the law enforcement officers' testimony:

210
Admitting testimony by law enforcement officers as to whether certain speech has the primary characteristic of an unprotected category (for instance, is a serious threat, or is obscene, or is false) allows the government not only to prohibit or burden that category of speech (true threats, obscenity, defamation), but also persuasively to shape the jury's determination of what speech falls into the unprotected category. The obvious risk is that the government will use its "aura of special reliability and trustworthiness," Gutierrez, 995 F.2d at 172, to describe as undeserving of constitutional protection speech that in fact is only unpopular with the government. In Watts, the Court looked to the reaction of those to whom the speech was directed to determine how the speech should be taken. 394 U.S. at 708, 89 S.Ct. 1399. Had the Secret Service run to the President to inform him of Watts' speech and warn him of the "threat," the Secret Service's reaction, and the President's resulting fear, presumably would not have been allowed to override the reaction of the actual audience to the speech.

211
Furthermore, the officers' testimony here quite naturally tended to blur the lines between various categories of speech — true threats, incitement, and perhaps some form of "putting in harm's way" — and therefore risked a jury finding of liability for speech that may not fall within the "threat" category as narrowly defined for First Amendment purposes. The officers testified that they told the plaintiffs the speech was a threat and one that should be taken seriously, but there is no indication that the officers distinguished between a "true" threat — a threat of violence by the speaker — and speech warning that a third party would harm the plaintiffs or speech containing a threatening quality because of its tendency to incite others or to put the plaintiffs in harm's way. Nor did the district court instruct the jury that the officers might use the term "threat" in a way that differed from the type of "threat" that does not receive constitutional protection.

212
The majority also concludes that the district court properly admitted the officers' testimony "to show the knowledge and intent of ACLA in distributing the posters regardless of the reaction they precipitated." Majority Op. at 1082. Testimony as to the statements made by the officers to the plaintiffs has little relevance to the intent and knowledge of the defendants. And, more importantly, the same First Amendment concerns come into play here: Under this rationale, if federal law enforcement officials dislike certain speech, they can take a substantial step towards rendering it unprotected by expressing publicly the view that such speech is threatening, because if the speaker then repeats the speech he does so with knowledge of the reaction it precipitated.

213
To the extent that our law allows law enforcement officers otherwise to testify directly on ultimate factual and legal questions that the jury must decide, we should draw the line at permitting the use of this persuasive aura in testimony that certain speech is of such a nature that it is undeserving of constitutional protection. Permitting such testimony cannot be reconciled with the role of the First Amendment to protect freedom of speech from suppression by the government.

III
Deposition Summaries

214
The majority approves — quite in passing — the district court's insistence that the parties submit as evidence summaries of deposition testimony, not the testimony itself. Majority Op. at 1083. As I read Federal Rule of Civil Procedure 32, which governs the admission of deposition testimony, it does not permit the substitution of summaries for actual testimony. Nor is there anything in the Federal Rules of Evidence or this court's case law to the contrary. Rather, it is a fundamental precept of our system for ascertaining facts that a jury is entitled to learn what a witness actually said, rather than an inexact rendition presented by counsel (and probably initially drafted by paralegals).

215
Language can be subtle, ambiguous and malleable. Paraphrases, as any judge reading lawyers' briefs knows, are no substitute for quotation of the actual words spoken by a witness. As often as not, a check of the transcript will reveal that the language the witness actually spoke, in context, may well mean something other than what counsel has represented.

216
That does not mean that counsel is lying, but that shades of meaning can be critical. "[A]s the childhood game of `telephone' well demonstrates, words change significantly in the course of their re-telling by third parties." United States v. Pena-Espinoza, 47 F.3d 356, 364 (9th Cir.1995) (Reinhardt, J., dissenting). Indeed, the game of "telephone" requires only that a listener repeat the exact language that he or she heard; a summary, in contrast, necessarily requires the more subjective choice of different words to convey the general idea communicated by the original language. "There is simply no way to summarize the contents of a transcript without offering to some degree a subjective view of their meaning and import." Id. Because that is so, summaries of witnesses' testimony are likely to distort the import of the actual testimony given and so impede the jury's search for truth.

217
Our legal system recognizes, in various contexts, that the same set of words may frequently lend itself to more than one reasonable interpretation. See, e.g., Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). There is no reason to believe that a lawyer will not adopt the interpretation most favorable to his or her client, so long as the interpretation is reasonable, even if not perhaps the most reasonable. See United States v. Leon-Reyes, 177 F.3d 816, 820 (9th Cir.1999) ("Summaries are normally prepared by an interested party and therefore may not be completely accurate or may be tainted with the preparing party's bias."). In our adversary system, it is the role of the trier of fact — not the advocate — ultimately to determine the meaning of witness testimony.

218
Further, access to the actual language a witness used — even on a cold record — is often essential to determining the witness's credibility and hence the weight, if any, to be accorded the testimony. Equivocations, hesitations, and internal contradictions may all be smoothed over by summaries that purport to extract the content of a witness's testimony. Requiring counsel to summarize testimony without allowing the trier of fact to have access to the testimony itself necessarily precludes the trier of fact from properly exercising his or her truth-determining role.

219
The record here provides concrete examples of various ways in which summaries can distort the import of the actual testimony and thereby impair the truth-ascertaining process. For instance, the summary of Michael Dodds' deposition condensed inaccurately the testimony he gave. The summary stated:

220
The other physician, on the Deadly Dozen List, from Dodds' region, Dr. Douglas Karpen, is from the Houston, Texas, area. Dodds believes that defendant Donald Treshman provided that name.

221
What Dodds actually said in his deposition regarding the source of Karpen's name for the Deadly Dozen list was "I don't know."17

222
The deposition of Roy McMillan provides an example of testimony that could reasonably be interpreted in either of two ways, but the summary provided the jury with only one interpretation. The summary stated:

223
As for the additional murder of Mr. Barrett [Dr. Britton's escort], McMillan felt that if it was, quote, right for one person, it would be right for someone else, end quote.

224
A look at McMillan's deposition transcript (which the defendants introduced in rebuttal) sheds a somewhat different light on the quotation included in the summary. In his deposition, McMillan was first asked about a petition in support of Michael Griffin, who killed Dr. Gunn, and then asked about "the second petition which was for Mr. Hill," who killed Mr. Barrett and Dr. Britton. The testimony went as follows:

225
[Answer:] This is identical — pretty much identical to the one that was circulated about the first abortionist's termination. And this was — this, the second one was regarding Paul Hill.

226
Question, and this one was put out by Michael Bray, is that right?

227
Answer, I am not sure who put it out, but I concurred that if it was right for one person, it would be right for someone else.

228
Thus, it appears that McMillan likely meant that if a petition in support of Griffin was right, so too was a petition in support of Hill. Either way, the interpretation should have been left entirely to the jury. (It is quite unlikely that this difference in meaning could have substantively affected the verdict, but that conclusion would require a separate inquiry.)

229
Finally, the record here also contains summary language that although technically accurate may nonetheless have conveyed a subtly different, but potentially important, sense of the speaker or of the events described from the testimony itself. The summary of Dawn Stover's deposition began with the sentence:

230
Dawn Stover is the associate director of defendant Advocates for Life Ministries....

231
Here is the excerpt from Stover's deposition transcript:

232
Question, are you still the associate director of Advocates for Life Ministries? Answer, I would guess that, but I have been inactive for so long that — I am still affiliated. I still talk to a couple of people in Advocates, but I don't do any directing and haven't done any directing for years. So — and having a title has never been that big of an issue. Question, was that ever a paid position? Answer, no. Question, so you don't know whether or not your status is currently associate director in terms of the eyes of the organization? Answer, I honestly don't know how they would perceive me as. I don't know, just because I have been inactive for so long, but they may still.

233
Certainly, the jury reasonably could have found from Stover's testimony that she "is the associate director" of Advocates for Life Ministries, as the summary stated. At the same time, however, the jury might have considered Stover's current role in the organization as quite different depending on which of the above versions of her testimony they heard. One set of words rarely conveys precisely the same meaning as a second, truncated version.

234
The majority today pays no heed to all these "dangers of witnesses summarizing oral testimony." United States v. Baker, 10 F.3d 1374, 1412 (9th Cir.1993), overruled on other grounds by United States v. Nordby, 225 F.3d 1053, 1059 (9th Cir.2000), and instead notes, without qualification, only that the presentation of deposition testimony "in the form of summaries was within the court's discretion under Rule 611(a)," Majority Op. at 1083. The very first mandate of Rule 611(a), however, requires the trial court to "make the interrogation and presentation [of evidence] effective for the ascertainment of truth." Fed.R.Evid. 611(a)(1).18 For all the reasons just discussed, substituting summaries of testimony for a word-for-word transcript itself can hardly serve as an "effective" mode "for the ascertainment of truth." See id.

235
Moreover, it is Fed. R. Civ. Proc. 32, not Rule 611(a) of the Rules of Evidence, that directly, and with particularity, governs the presentation of deposition testimony. As I read it, Rule 32 decidedly does not permit courts to authorize the use of summaries in place of actual testimony.

236
Rule 32 begins with this general provision:

237
At the trial ... any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used....

238
Rule 32(a) (emphasis added); see also Rule 32(b) ("[O]bjection may be made at the trial or hearing to receiving in evidence any deposition or part thereof for any reason which would require the exclusion of the evidence if the witness were then present and testifying."). A witness who is "present and testifying" is doing just that — "testifying," not providing capsule versions of his or her testimony. And using "any part or all of a deposition" does not equate to using a paraphrased, condensed version of a deposition, any more than a course syllabus directing students to read "Hamlet" intends to subsume within that directive the Classic Comics version of "Hamlet."

239
Rule 32 also specifically addresses the "Form of Presentation" of deposition testimony, giving no indication that a district court may admit a summary of deposition testimony in lieu of the testimony itself. The pertinent section states, in relevant part:

240
Except as otherwise directed by the court, a party offering deposition testimony pursuant to this rule may offer it in stenographic or nonstenographic form, but, if in nonstenographic form, the party shall also provide the court with a transcript of the portions so offered.

241
Rule 32(c) (emphasis added). The rule therefore clearly anticipates the admission of stenographic or nonstenographic forms of testimony, not summaries.19 Although Rule 32(c) does apply "[e]xcept as otherwise directed by the court," this caveat is most sensibly read to give the court discretion to direct either stenographic or non-stenographic presentation of deposition testimony, not to permit the presentation as "evidence" of summaries that approximate but do not reproduce the language the witness used in any form.

242
Bolstering this conclusion regarding Rule 32(c), Rule 28 provides for the taking of depositions in foreign countries "pursuant to a letter of request," and expressly grants the district court the discretion to admit the response to such a letter even if it is not a "verbatim transcript" of the testimony or if it exhibits "any similar departure from the requirements for depositions taken within the United States under these rules." See Rule 28(b). The assumption quite obviously underlying Rule 28 is that any report of testimony other than a "verbatim transcript" is a "departure from the requirements for depositions taken within the United States under these rules."

243
More generally, Rule 32 demonstrates an overall preference for the presentation of testimony in the manner that, to the extent practical, best provides the jury with complete information concerning the witness's demeanor. Rule 32(a), for example, clearly favors live testimony over deposition evidence by limiting the use of depositions to three situations: when an adverse party is the deponent; for impeachment purposes; or when the deponent is not available to testify at trial. Rule 32(a)(1)-(3). By so doing, the rule reflects the historical belief that live testimony better enables the jury to adjudge the credibility of a witness and therefore to determine the weight and import ascribed to the witness's testimony. Deposition testimony is itself only second-best.

244
When the rules do allow the admission of deposition testimony in a jury trial, Rule 32(c) permits a party in some instances to insist upon the presentation of testimony in "non-stenographic form," allowing the jury to hear and/or see the testimony as it was given. Rule 32(c) ("On request of any party in a case tried before a jury, deposition testimony offered other than for impeachment purposes shall be presented in nonstenographic form, if available, unless the court for good cause orders otherwise.") (emphasis added). Rule 32(c), by favoring audio and video recordings over the reading of a cold transcript, therefore establishes a preference for testimony that is the most like live testimony. Under this scheme, the presentation of deposition testimony in stenographic form is third-best.

245
Such presentation, however, at least allows the jury to hear or read the actual words used by the witness. Deposition summaries, unless accompanied by a transcript of the testimony, deprive the jury of even this opportunity. With Rule 32's clear preference for live testimony, or for testimony most resembling it, it makes little sense to think the rule tacitly allows for this new, fourth-best, form of evidence, so far removed from the in-person live testimony for which it is a substitute. I conclude that Fed. R. Civ. Proc. Rule 32 withholds from district courts the authority to require the substitution of summaries of deposition testimony for the testimony itself, where truth and falsity are at issue, and that the general language of Fed. R.Evid. Rule 611 cannot override that determination.

246
There is nothing in our case law to the contrary. We have, while expressing great caution, allowed summaries of evidence in narrow circumstances, but never as a complete substitute for actual transcripts on material matters of historical fact.

247
For instance, in Leon-Reyes, 177 F.3d at 820, a perjury case, we held that the district court did not abuse its discretion in allowing the use of summaries of testimony from a prior trial in which the defendant had allegedly committed perjury, emphasizing that the district court instructed the jury to consider the summaries only for determining the materiality of the false statements and not for the truth of the witnesses' underlying testimony. Pena-Espinoza, 47 F.3d at 360, permitted — although making clear that it did "not wish to condone such procedures" — admission of summaries prepared by the prosecution of telephone call transcripts. The court specifically noted that:

248
The transcripts themselves were in evidence and the jury had them to examine during deliberations; the ruling expressly permitted defense counsel to require a reading of the full transcript on cross-examination and to dispute the veracity of the readers' summaries.

249
Id. Similarly, Baker, 10 F.3d at 1411-12, found district court discretion pursuant to Fed.R.Evid. 611(a) to permit a government witness to present summary testimony and a chart estimating, on the basis of testimony at trial, the value of narcotics transactions. Critically, the district court made clear to the jury that the testimony and chart did not constitute evidence:

250
The [district] court instructed the jury that the summary testimony and exhibits were not evidence, did not represent an opinion of the court or the prosecution on the credibility of witnesses, and were to be disregarded to the extent the jury found them conflicting with the testimony and evidence received at trial.

251
Id. at 1411. As in Pena-Espinoza, the Baker court emphasized that this court is "not blind to the dangers of witnesses summarizing oral testimony" and that "such summaries should be admitted under Rule 611(a) only in exceptional cases." Id. at 1412.

252
Thus, when this court has upheld the admission of summary evidence under the abuse of discretion standard, we have done so not as a substitute for transcript evidence on matters of historical fact, but either on issues other than the truth of the matter testified to or as an assistance to the jury, while also including the actual transcripts in the record for the use of the jury or reviewing courts. And none of our cases discuss the provisions of Fed. R. Civ. Proc. Rule 32, because none of them involved deposition summaries as opposed to summaries of other forms of evidence.20

253
This is not a case in which the parties reached any agreement as to the summaries presented, so I do not consider whether such an agreement would be permissible. Nor did the defendants agree to the use of summaries at all; instead, they maintained a continuing objection to this procedure. And the district court did not review or revise the summaries after receiving objections prepared by the defendants, as it had originally planned to do. Cf. Leon-Reyes, 177 F.3d at 820 ("Summaries ... must be scrutinized by the trial court to ensure that they are accurate, complete, not unduly prejudicial, limited to the relevant issues, and confined by appropriate jury instructions.").

254
The district court did allow the defendants to present counter-summaries, colored with argument, and, in rebuttal, to introduce excerpts from the transcripts. Such an adversarial procedure, however, does not ensure that the jury will have before it the evidence necessary to informed decision-making. The party responsible for summarizing the testimony may have little reason to move for the admission of the underlying testimony, precisely because that party may prefer its summary to the testimony itself. Likewise, the adverse party will, hopefully, point out blatant inconsistencies between the summary and the testimony, but may choose otherwise to avoid providing the jury with testimony that largely supports a summary introduced by the other side.

255
Nevertheless, the fact remains that the jury must have the opportunity to review the actual evidence — the transcripts of the testimony — when deliberating as to the meaning of testimony. It is nonsensical to expect the jury to determine the credibility of witnesses and testimony, the special province of the jury, without providing the jury with access to that testimony. Just as we, as judges, do not read attorneys' paraphrases of statutes when we try to discover what the legislature meant, see Fed. R. App. Proc. Rule 28(f), jurors cannot sensibly evaluate the meaning and credibility of words without knowing what those words are.

256
One final note: The majority presumably finds that the district court has the discretion under Rule 611(a) to require deposition summaries in lieu of the testimony itself in order to "avoid needless consumption of time." Rule 611(a)(2). Because the presentation of deposition summaries, without the agreement of the parties and the admission of the corresponding excerpts, is not "effective for the ascertainment of truth," Rule 611(a)(1), the consumption of time caused by the presentation of actual testimony is not "needless." Moreover, by providing an additional issue for the parties to dispute, the use of summaries is just as likely to increase as to decrease the time spent by counsel and by the court.

257
I recognize that district courts can and should reasonably limit the amount of time expended on the presentation of deposition testimony. This authority does not, however, give trial courts the discretion to replace such testimony entirely with a Reader's Digest Condensed Books version.21

IV.
Conclusion

258
As waves of fervent protest movements have ebbed and flowed, the courts have been called upon to delineate and enforce the line between protected speech and communications that are both of little or no value as information, expression of opinion or persuasion of others, and are of considerable harm to others. This judicial task has never been an easy one, as it can require — as here — recognizing the right of protesting groups to question deeply held societal notions of what is morally, politically, economically, or socially correct and what is not. The defendants here pose a special challenge, as they vehemently condone the view that murdering abortion providers — individuals who are providing medical services protected by the Constitution — is morally justified.

259
But the defendants have not murdered anyone, and for all the reasons I have discussed, neither their advocacy of doing so nor the posters and website they published crossed the line into unprotected speech. If we are not willing to provide stringent First Amendment protection and a fair trial to those with whom we as a society disagree as well as those with whom we agree — as the Supreme Court did when it struck down the conviction of members of the Ku Klux Klan for their racist, violence—condoning speech in Brandenburg — the First Amendment will become a dead letter. Moreover, the next protest group—which may be a new civil rights movement or another group eventually vindicated by acceptance of their goals by society at large — will (unless we cease fulfilling our obligation as judges to be evenhanded) be censored according to the rules applied to the last. I do not believe that the defendants' speech here, on this record and given two major erroneous evidentiary rulings, crossed the line into unprotected speech. I therefore dissent.

Notes:

1
In so stating — and elsewhere in this opinion — I do not address the constitutional viability of a cause of action for putting another in harm's way by publicizing information that makes it easier for known or suspected potential assailants to find an intended victim. There was no such cause of action in this case, as Judge Kozinski observes, and I express no view upon whether or under what circumstances such a cause of action could be stated under the law, including under the First Amendment

2
Similarly, the First Amendment's overbreadth doctrine extends some protection to speech that is without First Amendment value in order to limit self-censorship of speech that does possess this valueSee Massachusetts v. Oakes, 491 U.S. 576, 581, 109 S.Ct. 2633, 105 L.Ed.2d 493 (1989).

3
See New York Times, 376 U.S. at 279-80, 84 S.Ct. 710 (a public official may not recover damages "for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not"); Curtis Publ'g Co. v. Butts, 388 U.S. 130, 164, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (opinion of Warren, C.J., concurring in the result) (New York Times standard applies to defamation cases brought by public figures); Gertz, 418 U.S. at 347-49, 94 S.Ct. 2997 (New York Times standard not required for cases brought by private figure plaintiffs; instead, the states may only not "impose liability without fault" for the defamation of a private figure plaintiff — although a different standard may apply if "the substance of the defamatory statement [does not] make[] substantial danger to reputation apparent" — but the states "may not permit recovery of presumed or punitive damages" without proof of actual malice); Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 761, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (opinion of Powell, J.) (states may allow private figure plaintiffs to recover, without proof of actual malice, presumed or punitive damages for defamatory speech "involving no matters of public concern.").

4
I discuss below the constitutional importance of the latter requirement — that any proscribed threat communicate the intention of the speaker or his or her agents

5
I note that there is one way in which the speech here differs from defamation: False, defamatory speech, even on matters of public concern, does not haveany significant First Amendment value. R.A.V., 505 U.S. at 383, 112 S.Ct. 2538. Although "true threats" also lack such value as a general matter, a "true threat" that includes only facially-protected speech nonetheless does have First Amendment value, because it not only is threatening but also has another meaning — the literal, facially-protected meaning — which here falls within the heart of First Amendment speech. For this and other reasons, the categories of defamatory speech and the rules applicable to them cannot rigidly determine the analysis applicable in threats cases.

6
During the press conference, Mr. Kelner, the defendant, "was seated in military fatigues behind a desk with a .38 caliber `police special' in front of him," next to "another man ... dressed in military fatigues."Id. The gun and uniform seem to me simply a prop and costume designed to enhance the communication of seriousness of purpose, not proof that the defendant was involved contemporaneously in actual violence.

7
The jury in this case was instructed that "the mere abstract teaching of the moral propriety or even moral necessity for a resort to force and violence is protected speech under the First Amendment," and that "[y]ou are not to consider any evidence that the three statements allegedly `incite' violence against plaintiffs."

8
InKelner, the jury was instructed that it needed to find that "Kelner `intended the words as a threat against Yassir Arafat and his lieutenants.'" 534 F.2d at 1025. The Kelner court rejected a different intent requirement, namely, an intent to carry out the threatened action. Id. at 1025-27. The majority erroneously concludes that the dissenters would require that to find a "true threat," the speaker must have had the latter sort of intent — that is, the speaker must "actually intend to carry out the threat." See Majority Op. at 1075. To the contrary, there has been no intimation in either dissent that the speaker need have the intention, or the ability, to do so. Rather, I propose the inclusion of a "specific intent" requirement with regard to the speaker's intent to threaten-that is, a requirement that the judge or jury determine whether the speaker intended to place the listener in fear of danger from the speaker or his agents.

9
The majority opinion does not appear to embrace any such subjective intent standard as aconstitutional requirement, but does suggest that any such requirement was met here through the instruction on FACE's statutory elements. The jury, however, was specifically instructed several times, quite emphatically, that there is no subjective intent requirement in adjudging whether or not a statement is a "true threat." In closing argument, counsel for plaintiffs also informed the jury that subjective intent was not relevant. Further, in a separate instruction devoted to the case's various intent issues, the trial judge reminded the jury that it did have to find some form of intent when it considered the RICO charges against the defendants and when it considered punitive damages, but did not state that the jury had to find intent when considering whether the defendants violated FACE.
The very next instruction concerned the FACE cause of action and stated, ungrammatically and nearly incoherently, that the plaintiff's must prove that the defendant "made the threat of force to intimidate ... the plaintiff's... ability to ... provide reproductive health services." Although "intimidate" was defined, correctly, as "place a person in reasonable apprehension of bodily harm," the FACE instruction left out the statute's clear motive or purpose requirement — that to be liable the defendant must act "because that person is or has been, or in order to intimidate such person... from ... providing reproductive health services," 18 U.S.C. § 248(a)(1), substituting a confused and confusing locution. A jury specifically and repeatedly admonished not to take into account the defendants' subjective intent would not likely understand the obscure FACE instruction as a requirement that it should do so.
There was also a RICO cause of action with separate elements. While the RICO instruction required, in addition to a true threat, an "intent of depriving a plaintiff of his or her... protected right to provide abortion services," that is not equivalent to requiring an intent to communicate that the speaker or his or her confederates would physically injure the plaintiff.

10
Part of the injunction fails to comply with the First Amendment for an additional reason. The injunction not only prevents the defendants from further distributing the posters, it also prevents them from possessing the posters or their equivalents. In effect, this latter part of the injunction regulates the type of written materials that the defendants may possess in the privacy of their homes, directly contradicting the Supreme Court's holding inStanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969):
If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds.
Id. at 565; see also Free Speech Coalition, 122 S.Ct. at 1403 ("First Amendment freedoms are most in danger when the government seeks to control thought....").
The majority nonetheless upholds the injunction against possession of the posters, distinguishing Stanley on the basis that "the posters in this case are quite different from a book; the `wanted'—type posters themselves — not their ideological content — are the tool for threatening physicians. In this sense, the posters' status is more like conduct than speech." Majority Op. at 1087. But, whatever else they may be, the posters are speech — they express ideas through the use of words and pictures.
The majority also asserts that the "First Amendment interest in retaining possession of the threatening posters is de minimis, while ACLA's continued possession of them constitutes part of the threat." Id. at 1087. This summation ignores the fact that the posters do have First Amendment value — they express ideas about one of the most contentious political and moral issues of our time. And confined to the defendants' homes, the posters do not place anyone in apprehension of danger or disrupt their lives; they only influence "the moral content of [the defendants'] thoughts." Stanley, 394 U.S. at 565, 89 S.Ct. 1243. As such, the First Amendment value of the posters is not outweighed by any competing considerations.

11
The term "Aesopian language" developed in Tsarist Russia to refer to language that, like Aesop's fables, disguises the true meaning of speech by the use of metaphors, symbols and analogies, in order to avoid censorship

12
One defendant had been convicted of serious violence some years before the posters and website were published, so I except him from this part of the discussion

13
I note that on the instructions actually given to the jury, it is not easy to perceive the pertinence of much of this evidence. In particular, apart from extensive evidence of defendants' public statements concerning violence against abortion providers, there was also a great deal of evidence concerning their statements in meetings among anti-abortion activists. The jury was instructed that although speech can be a "true threat" no matter what defendants' subjective intent, that intent is nonetheless pertinent context. I am not sure I see why, but since I would make subjective intent directly relevant, the point is not of great importance to this dissent

14
"Unconditional" refers to the degree of determination contained in the threat, not whether it is "conditioned" in the sense that the target could avoid the harm by bowing to the speaker's will

15
I note as well that the majority, while it articulated ade novo review standard with respect to the true threat standard it did apply, did not in fact review the record with an eye to First Amendment concerns such as those I have discussed, nor did it include the intent issue within its review. (Actual malice, a state of mind standard, is precisely the issue upon which the Supreme Court has closely scrutinized the record in defamation cases. See, e.g., Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 686, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)).

16
Rule 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

17
The district court did not allow Treshman to respond in his closing argument to the plaintiffs' argument based on the summaries because the actual transcripts were not in evidence

18
Rule 611(a) provides in its entirety:
The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

19
The rules make clear that "nonstenographic" refers to audio or visual recordingSee, e.g., Rule 32 Advisory Comm. Note: ("This new subdivision [c] ... is included in view of the increased opportunities for video-recording and audio-recording of depositions under revised Rule 30(b)."); Fed. R. Civ. Proc. 30(b)(2) ("Any party may arrange for a transcription to be made from the recording of a deposition taken by non-stenographic means."); Rule 30 Advisory Comm. Note ("The primary change in subdivision (b) is that parties will be authorized to record deposition testimony by nonstenographic means without first having to obtain permission of the court or agreement from other counsel."); Rule 30 Advisory Comm. Note ("A party choosing to record a deposition only by videotape or audiotape should understand that a transcript will be required by Rule 26(a)(3)(B) and Rule 32(c) if the deposition is later to be offered as evidence at trial...."); Rule 26(a)(3) ("[A] party must provide ... the following information regarding the evidence that it may present at trial ...: (B) the designation of those witnesses whose testimony is expected to be presented by means of a deposition and, if not taken stenographically, a transcript of the pertinent portions of the deposition testimony.").

20
Although the Fourth, Fifth, and Seventh Circuits have generally approved the use of deposition summaries for the oral presentation of deposition evidence, I have found no case in which it is clear that the pertinent portions of the transcripts were not also admitted as evidence and available for jury reviewSee Oostendorp v. Khanna, 937 F.2d 1177, 1179-80 (7th Cir.1991); Walker v. Action Indus., Inc., 802 F.2d 703, 712 (4th Cir.1986); Kingsley v. Baker/Beech Nut Corp., 546 F.2d 1136, 1141 (5th Cir.1977) (deposition transcripts definitely admitted as evidence).

21
I do not address whether the use of deposition summaries in this case was harmless error,see Cerrato v. San Francisco Cmty. Coll. Dist., 26 F.3d 968, 974 (9th Cir.1994) ("The harmless error standard in civil cases is whether the jury's verdict is more probably than not untainted by the error."), because the majority does not so hold.